STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

20-211

VICTORIA ROACH

VERSUS

THE STATE OF LOUISIANA THROUGH THE
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT

consolidated with

20-212

MICHAEL LEE MCVEY AND
NORMA CHERYL MCVEY

VERSUS

ALLSTATE INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2014-4275 C/W NO. 2014-4289
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Van H. Kyzar, Sharon Darville Wilson, and Charles G.
Fitzgerald, Judges.

AFFIRMED AS AMENDED.

Jeff Landry
Attorney General
Julius W. Grubbs, Jr.
Special Assistant Attorney General
P. O. Box 11040
New Iberia, LA 70562-1040
(337) 365-5486
COUNSEL FOR DEFENDANT/APPELLANT:
    State of Louisiana
    Department of Transportation and Development

W. Thomas Barrett, III
3401 Ryan Street, Suite 307
Lake Charles, LA 70605
(337) 474-7311
COUNSEL FOR PLAINTIFF/APPELLEE:
    Victoria Roach

W. Thomas McCall, Jr.
Jones Walker LLP
445 North Boulevard, Suite 800
Baton Rouge, LA 70802
(225) 248-2154
COUNSEL FOR PLAINTIFF/APPELLEE:
    Victoria Roach

Barry A. Roach
Christopher S. LaCombe
Michael H. Schwartzberg
Larry A. Roach, Inc.
2917 Ryan Street
Lake Charles, LA 70601
(337) 433-8504
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Michael Lee McVey
    Norma Cheryl McVey

Katherine Paine Martin
Gretchen Heider Mayard
Martin Mayard, L.L.C.
P. O. Box 81338
Lafayette, LA 70598-1338
(337) 291-2440
COUNSEL FOR DEFENDANT/APPELLEE:
    State Farm Mutual Automobile Insurance Company

**KYZAR, Judge.**

The defendant, the State of Louisiana, through the Department of Transportation and Development, appeals from a jury verdict finding it twenty percent at fault for causing a single-vehicle accident which resulted in the death of one of the passengers. The jury found the Department of Transportation and Development at fault based on the placement of the intersectional traffic signal pole struck by the vehicle, which was being driven by an intoxicated driver. For the following reasons, we affirm as amended.

## DISCUSSION OF THE RECORD

This litigation arises from an accident which occurred at the intersection of Louisiana Highway 385 with Louisiana Highway 3092. At approximately 4:16 a.m. on October 19, 2013, Ryan A. Adams was driving southbound on Hwy 385 in a 2013 Honda Accord owned by Michael Lee McVey. Hannah Clare McVey, Mr. McVey's daughter, and Victoria Roach were passengers in the vehicle. After passing through the intersection, Mr. Adams' vehicle drifted from the left outer lane into a rigid traffic signal pole, which was located approximately four feet from the shoulder and fourteen feet from the travel lane.[1] Both Mr. Adams and Ms. Roach were injured as a result of the accident; Hannah suffered fatal injuries. Subsequent to the accident, it was determined that Mr. Adams had a blood alcohol concentration (BAC) of 0.13%.[2]

On October 17, 2014, Ms. Roach filed a petition for damages against the State of Louisiana, Department of Transportation and Development (DOTD),

---

[1] Ms. Roach and the McVeys' expert, Doug Robert, asserted that the signal pole was located three feet and ten inches from the shoulder and thirteen feet and ten inches from the travel lane. DOTD's expert, Dr. Joseph Blaschke, asserted that the signal pole was located four feet from the shoulder and fourteen feet from the travel lane.

[2] Pursuant to La.R.S. 14:98, an operator of a motor vehicle is legally intoxicated when their BAC is 0.08% or more by weight based on grams of alcohol per one hundred cubic centimeters of blood.

alleging that DOTD was strictly liable for the defective condition of the signal pole and that it had notice of the signal pole's defective condition but failed to correct it. That same day, Michael Lee McVey and Norma Cheryl McVey, Hannah's parents, filed a wrongful death action against Mr. Adams and his parents' liability insurer, Allstate Insurance Company;[3] State Farm Mutual Automobile Insurance Company, the uninsured motorist (UM) insurer of the 2013 Honda Accord and the liability insurer of two other vehicles owned by the McVeys; and DOTD. Upon motion of DOTD, the two actions were consolidated under Ms. Roach's lawsuit.

After various procedural rulings, the consolidated lawsuits proceeded to a jury trial solely against DOTD. Following a six-day trial, the jury returned a verdict allocating eighty percent fault to Mr. Adams and twenty percent fault to DOTD. On the issue of damages, the jury awarded Ms. Roach general and special damages in the amount of $1,006,275.00. It further awarded the McVeys wrongful death damages in the amount of $10,020,000.00.

On June 27, 2019, Ms. Roach and the McVeys (collectively referred to as Plaintiffs) filed a joint motion to tax costs, seeking to have DOTD assessed with all trial costs in the amount of $45,804.30 and $31,943.71, respectively. On July 23, 2019, DOTD filed its own motion to tax costs, seeking to have $26,023.15 in trial costs taxed as costs. It further sought to have Allstate, State Farm, Mr. Adams, Ms. Roach, and the McVeys assessed with a portion of the trial costs. Following a September 9, 2019 hearing on the motions, the trial court assessed DOTD with all trial and court costs.

---

[3] The McVeys initially named XYZ Insurance Company, the insurer of Mr. Adams' mother, as a defendant. However, they later amended their petition to substitute Allstate as his mother's insurer. Allstate, who was the insurer of Mr. Adams' father, had already been named as a defendant in the suit.

2

On September 17, 2019, the trial court rendered a written judgment in conformity with the jury verdict. However, based on the percentage of fault allocated to DOTD, the trial court reduced Ms. Roach's damage award from $1,006,275.00 to $201,255.00 and the McVeys' damage award from $10,020,000.00 to $2,004,000.00. Furthermore, in accordance with the $500,000.00 cap imposed for personal injury and wrongful death damage awards against the state by La.R.S. 13:5106,[4] the McVeys' damage award was further reduced to $504,000.00. The judgment assessed DOTD with Ms. Roach's and the McVeys' trial expenses, in the amount of $45,354.30 and $32,174.71, respectively, and all court costs, in the amount of $9,260.00 and $2,960.90, respectively.

On October 17, 2019, DOTD moved for a new trial and for a judgment notwithstanding the verdict and/or in the alternative, for remittitur. Following an October 28, 2019 hearing, the trial court orally denied both motions. At the close of the hearing, DOTD filed a motion to suspensively appeal the jury verdict, which the trial court granted. A written judgment denying DOTD's post-trial motions was rendered by the trial court on October 29, 2019.

On appeal, DOTD asserts ten assignments of error:

1.  The trial court improperly excluded evidence regarding the fault of Victoria Roach.

2.  The trial court improperly excluded evidence and testimony of the blood alcohol levels of Victoria Roach and Hannah McVey.

3.  The trial court improperly granted a directed verdict finding no liability on the part of Hannah McVey.

4.  The trial court improperly imposed a duty on DOTD to protect against harm caused by highly intoxicated motorists such as Ryan Adams.

---

[4] La.R.S. 13:5106(B)(2) provides that the total liability of the state for personal injury and wrongful death damages shall not exceed $500,000.00.

3

5.    The trial court improperly admitted into evidence certain documents referencing guidelines not in place at the time the Project was designed and/or built.

6.    The jury improperly imposed a duty on DOTD to go above and beyond its mandate to follow the applicable editions of the MUTCD and AASHTO, and improperly found that an unreasonable risk of harm existed.

7.    The jury improperly found DOTD liable despite a lack of evidence that DOTD knew or should have known of a defect posing an unreasonable risk of harm.

8.    The jury improperly allocated 20% liability to DOTD.

9.    The trial court improperly excluded certain evidence pertaining to Roach's future earning capacity which contributed to the jury improper award of Roach future earnings in the amount of $420,000.00.

10.    The trial court erred in its assessment of expert fees and other court costs solely against DOTD.

## OPINION

This court, in *Sonnier v. State, Department of Transportation & Development*, 18-73, 18-74, 18-75, p. 3 (La.App. 3 Cir. 6/6/18), 249 So.3d 51, 54-55 (alteration in original), set out the applicable standard of review for this matter:

A trial court has great discretion in evidentiary matters, and its decisions regarding motions in limine are reviewed using the abuse of discretion standard. *See Scott v. Dauterive Hosp. Corp.*, 02-1364 (La.App. 3 Cir. 4/23/03), 851 So.2d 1152, *writ denied*, 03-2005 (La. 10/31/03), 857 So.2d 487; *see also Heller v. Nobel Ins. Group*, 00-261 (La. 2/2/00), 753 So.2d 841.

The long-standing standard for appellate review of jury determinations of fact was set forth in *Mart v. Hill*, 505 So.2d 1120 (La.1987). There, the court established a two-part test for the reversal of a factfinder's determinations: (1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) determine that the record establishes that the trial court's finding is clearly wrong (manifestly erroneous). *Id.*

"[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Stobart v. State through DOTD*, 617 So.2d 880, 882 (La.1993). Additionally, "the reviewing court

4

must always keep in mind that 'if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.' " *Id.* at 882-83 (quoting *Housley v. Cerise*, 579 So.2d 973, 976 (La.1991) ).

DOTD alleges the trial court committed numerous legal errors through either the exclusion or admission of evidence into the record. Because the finding of such an error could result in a *de novo* review if the error interdicted the jury's fact-finding process, we address these assignments of error first. *Wright v. Bennett*, 04-1944 (La.App. 1 Cir. 9/28/05), 924 So.2d 178.

### *Assignments of Error Numbers One and Two*

In its first two assignments of error, DOTD argues the trial court improperly excluded evidence pertaining to Ms. Roach's fault and evidence and testimony pertaining to the BAC of both Ms. Roach and Hannah. Prior to trial, Ms. Roach and the McVeys each filed a motion in limine to exclude this evidence from being introduced during the trial, which the trial court granted. In particular, Ms. Roach sought to exclude evidence of her fault and her BAC, and the McVeys sought to exclude evidence of Hannah's BAC. The trial court granted both motions.

### *Ms. Roach's Fault/BAC*

DOTD argues that the trial court erred in excluding evidence of Ms. Roach's comparative fault because it properly pled her fault as an affirmative defense in its answers. We disagree.

In its answer to both Ms. Roach's and the McVeys' petition, DOTD alleged that Mr. Adams was solely at fault in causing the accident. However, it further alleged that in the event it was found liable, it expressly pled the contributory negligence and comparative fault of both Mr. Adams and Hannah. DOTD also alleged, "The accident which forms the basis of the plaintiffs' action resulted from

5

the fault of the [sic] Ryan A. Adams and Hannah Clare McVey and/or the fault of third parties."

DOTD further alleged that it "expressly avers, adopts, and pleads all applicable affirmative defenses recognized under Louisiana Code of Civil Procedure article 1005, as well as all applicable defenses recognized under the jurisprudence as if copied herein *verbatim* and *in extenso*." In its amended answer to both petitions, DOTD amended this allegation to allege that it "avers, adopts and pleads all applicable affirmative defenses recognized under Louisiana Code of Civil Procedure article 1005, as well as the statutory defenses of L.S.A.-R.S. 9:2798.1, L.S.A.-R.S. 9:2800, and L.S.A.-R.S. 13:5106."

After hearing argument on this issue, the trial court ruled, "I do not believe that the State has appropriately pleaded sufficient to allow the inclusion of Ms. Roach as possibly being part of the fault in this matter." It further stated, "Now, accordingly, in that vain [sic], then her intoxication level is irrelevant and has nothing to do in this trial." Judgment on these and other issues was rendered on May 28, 2019.

Louisiana Code of Civil Procedure Article 1003 provides:

> The answer shall comply with Articles 853, 854, and 863 and, whenever applicable, with Articles 855 through 861. It shall admit or deny the allegations of the petition as required by Article 1004, state in short and concise terms the material facts upon which the defenses to the action asserted are based, and shall set forth all affirmative defenses as required by Article 1005. It shall also contain a prayer for the relief sought. Relief may be prayed for in the alternative.

Pursuant to La.Code Civ.P. art. 1005, "The answer shall set forth affirmatively" all defenses, including comparative fault.

> Affirmative defenses raise issues outside those presented in a plaintiff's petition for damages, thus, it is necessary that it is pled in order to afford the plaintiff an opportunity to adjust its case in light of the new issue raised. *Rider v. Fontenot*, 463 So.2d 951 (La.App. 3 Cir. 1985). "In the absence of inclusion of an affirmative defense in the

6

answer, evidence can be adduced thereon only in the absence of an objection thereto." *Red Barn Chems., Inc. v. Lassalle*, 350 So.2d 1315, 1317 (La.App. 3 Cir. 1977). "If the affirmative defense is allowed despite the defense not being raised in answer, the result is a surprise 'trial by ambush' that unfairly aids the defendant, who knew about the defense even though plaintiff was kept in ignorance of the defense." *Rider*, 463 So.2d at 956. *See also Patterson v. State*, 95-1668 (La.App. 3 Cir. 12/11/96), 685 So.2d 473, *writs denied*, 97-27 (La. 2/21/97), 688 So.2d 513, 97-108 (La. 2/21/97), 688 So.2d 513.

*Milligan v. Heritage Manor Health & Rehab. Ctr.*, 19-887, pp. 8-9 (La.App. 3 Cir. 8/19/20), 304 So.3d 922, 927.

A trial court is granted vast discretion in deciding evidentiary issues; thus, "its decisions regarding motions in limine are reviewed using the abuse of discretion standard." *Sonnier*, 249 So.3d at 54.

After reviewing DOTD's original and amended answers in both lawsuits, we find no abuse of discretion in the trial court's exclusion of evidence pertaining to Ms. Roach's fault and her BAC. Although DOTD specifically asserted the negligence of Mr. Adams and Hannah, it made no such assertion with regard to Ms. Roach, nor do we find that its allegation of third-party fault was sufficient to assert her comparative fault.

Although the Louisiana Code of Civil Procedure does not define who qualifies as a "third person," La.Civ.Code art. 3506(32) states that "[w]ith respect to a contract or judgment," third persons are those who are not parties. Black's Law Dictionary defines "third party" as "[s]omeone who is not a party to a lawsuit, agreement, or other transaction but who is [usually] somehow implicated in it; someone other than the principal parties." BLACK'S LAW DICTIONARY (11th ed. 2019).

The Louisiana Code of Civil Procedure provides that "[p]ersons other than those made parties to the original action may be made parties" to both reconventional demands and cross claims. La.Code Civ.P. arts. 1064, 1073. A

7

third person also has the right to intervene in a pending action to assert their interest in that matter. La.Code Civ.P. art. 1091. Finally, a defendant and a defendant in reconvention have the right to file a third-party demand against "any person, including a codefendant, who is his warrantor, or who is or may be liable to him for all or part of the principal demand." La.Code Civ.P. arts. 1111, 1112.

Accordingly, Ms. Roach does not qualify as a third person in her suit against DOTD. Nor does she qualify as a third person in the McVeys' suit because DOTD identified her in its answer as one of the passengers involved in the accident. Thus, DOTD obviously did not consider Ms. Roach a third person nor did it "state in short and concise terms the material facts upon which" a defense of her comparative fault was based. La.Code Civ.P. art. 1003. Accordingly, based on DOTD's failure to affirmatively assert Ms. Roach's comparative fault in its answer, we find that the trial court did not abuse its discretion by excluding this evidence. Because of this finding, we further find no abuse of discretion in the exclusion of her BAC.

*Hannah's BAC*

DOTD argues that the trial court erred in excluding evidence of Hannah's BAC and testimony on this subject by its expert forensic toxicologist, Dr. Gary H. Wimbish, because the evidence was relevant in determining her comparative fault. We disagree.

The McVeys filed a motion in limine seeking to exclude evidence of Hannah's BAC, arguing that it was irrelevant, highly prejudicial, and would not aid DOTD's defense of comparative fault. Further, Plaintiffs jointly moved to exclude a supplemental report and opinion by Dr. Wimbish on the issue of Hannah's BAC because despite testifying in his deposition that he would not be rendering an opinion as to Hannah's intoxication, he submitted a supplemental report eight days

8

later addressing that issue. DOTD opposed these motions, arguing that the evidence was relevant because Hannah's comparative fault was at issue.

In excluding evidence of Hannah's BAC, the following discussion occurred between the trial court and DOTD's counsel:

**The Court:**

It appears from what I've read so far that there's not going to be any suggestion that Hannah McVey was not intoxicated. And, again, I use the term very loosely. You know, "intoxicated" means a lot of things, and we all know that.

. . . .

**DOTD:**

There are different levels, yes, sir.

**The Court:**

-- no one is going to deny that from at least 8:00 o'clock the evening before, Hannah was probably consuming some alcoholic beverages. She had provided them for friends to celebrate Ms. Roach's birthday.

**DOTD:**

Yes, sir.

**The Court:**

At some point in the evening, they went to OB's Deli, presumably continued drinking, and then the next point of interest is when Hannah attempts to drive off from OB's. The testimony of Ms. Roach is that it was apparent to her that she couldn't drive, because she almost went into the ditch or the gully that's across that side street there. And Ms. Roach indicated, "Look, you can't drive. Let Ryan drive, or Mr. Adams drive." Okay?

. . . .

**DOTD:**

That's what I understand to be the facts, too.

9

**The Court:**

So no one is going to contend that Hannah – poor Hannah, she was tired. She just fell asleep. So no one is suggesting she was not intoxicated. Again, using the term very loosely. Why does the jury need to hear an intoxication level, to make it more convincing? Is someone suggesting that she was not intoxicated?

**DOTD:**

Well, you know, we haven't been before the jury yet. I haven't heard –

**The Court:**

Sure.

**DOTD:**

-- the plaintiffs put on their case but at this point in time, they – they don't seem to be doing that, "they" being the plaintiffs.

Following this colloquy, the trial court excluded evidence of Hannah's BAC, stating as follows:

You know, regarding Hannah . . . I don't think the jury needs to hear anything regarding the numbers. It seems at least at this point unless something changes at the trial, Mr. Grubbs . . . if they start doing a 180 on you regarding intoxication levels, then certainly, I'll give you the opportunity to reurge this, but I don't think the jury needs to hear anything about numbers as far as Hannah is concerned.

According to La.Code Evid. art. 401, relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." La.Code Evid. art. 402. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403.

10

The trial court, in this instance, evidently found the probative value of Hannah's BAC was substantially outweighed by the danger of unfair prejudice. Accordingly, we find no abuse of discretion in its decision to exclude the evidence.

***Assignment of Error Number Five***

In its fifth assignment of error, DOTD argues that the trial court improperly admitted into evidence certain documents referencing guidelines not in place at the time the plans for State Project No. 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 (the project), which included the intersection of Hwys 385 and 3092, were approved. Particularly, DOTD argues that the trial court erred in allowing into evidence an April 9, 2013 memorandum (Allain Memo) from Peter Allain, DOTD's Traffic Engineering Division Administrator, to Richard Savoie, DOTD Chief Engineer. DOTD further complains that it was error for the trial court to permit the introduction of excerpts from the 2009 edition of the Manual on Uniform Traffic Control Devices (MUTCD); excerpts from the 2015 edition of DOTD's Traffic Signal Design Manual (TSDM); excerpts from the 2011 edition of the AASHTO Roadside Design Guide (RDG); DOTD's Policy for Roadside Vegetation Management; DOTD's Engineering Directives and Standards No. 1.1.1.21; and DOTD's investigative report on the October 19, 2013 accident.

DOTD primarily argues that the introduction of the Allain Memo was erroneous due to the possible confusion it created as to the proper standard applicable to DOTD and its engineers in designing and constructing the project. Thus, it asserts that introduction of the Allain Memo was unduly prejudicial, and it represented a subsequent remedial measure.

Plaintiffs counter, arguing that the Allain Memo was in effect six months prior to the October 19, 2013 accident, and one of the main issues in this case revolved around the standards applicable to DOTD in designing the project and

11

whether it followed those standards in its placement of the signal pole in question. Plaintiffs assert that the memo was highly relevant because it showed that DOTD acknowledged, prior to the accident, that rigid signal poles should be located further away from the shoulder. Further, as it was written by Mr. Allain, an employee and witness for DOTD, it was highly relevant to his testimony regarding both DOTD's and the national standards that were the central issue in this matter, and whether they were followed. Plaintiffs further argue that DOTD's expert, Dr. Joe Blaschke, relied on the memorandum in his opinion and deposition testimony; thus, it was relevant and admissible for that reason as well.

"The district court is awarded vast discretion in its decisions on evidentiary rulings, and its decision to admit or exclude evidence will not be reversed on appeal absent a clear showing of abuse of that discretion." *Young v. Joy*, 09-756, p. 2 (La.App. 3 Cir. 2/3/10), 30 So.3d 1116, 1119. "Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Despaux v. RSC Equip. Rental Inc.*, 17-765, pp. 2-3 (La.App. 4 Cir. 4/25/18), 246 So.3d 806, 809, *writ denied*, 18-1009 (La. 10/8/18), 253 So.3d 794 (citing La.Code Evid. art. 401).

Louisiana Code of Evidence Article 407 provides, "In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." However, it goes on to state, "This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility." *Id.*

12

> "In general, remedial measures taken after an incident of negligent conduct are not admissible in evidence because such evidence would discourage people from taking steps to prevent future harm." *Toups v. Sears, Roebuck & Co., Inc.*, 507 So.2d 809, 816 (La.1987).

> > The prohibition against evidence of subsequent remedial measures is designed to bring within the scope of the rule any change, repair or precaution *subsequent* to an accident. The prohibition covers only measures taken *after* an event, such as post-accident repairs, installation of safety devices, changes in design, the removal of dangerous conditions, *changes in procedure*, the dismissal of an employee charged with causing an accident, changes in regulations, and changes in labels or instructions.

> *N. Assurance Co. v. Louisiana Power & Light Co.*, 580 So.2d 351, 357 (La.1991) (citations omitted).

*Hanover Ins. Co. v. Riceland Aviation, Inc.*, 18-892, pp. 7-8 (La.App. 3 Cir. 4/10/19), 269 So.3d 911, 917-18.

In the Allain Memo, Mr. Allain indicated that the desirable distance for the placement of a rigid signal pole, whether span wire[5] or mast arm,[6] was six feet from the shoulder on roadways with a greater than four-foot shoulder. He also stated, "This policy should be incorporated into all applicable design manuals, standard plans, special details, and projects."

While this can be construed as a subsequent standard or recommendation for DOTD's post-design and post-construction of the intersection and placement of the signal pole, it was not a remediation subsequent to the accident. It is further highly relevant to the case and the interpretation of the recommendation that Plaintiffs suggest existed at the time of the accident. While Mr. Allain denied that the memo somehow mandated that the signal pole be placed six feet from the shoulder, he

---

[5] In a span-wire installation, signal heads are suspended from cables spanning the intersection.

[6] In a mast-arm installation, signal heads are suspended from cantilevered mast arms, which project over the intersection from the rigid signal pole.

13

clearly suggested that the proper distance was six feet from the shoulder, as follows:

Q.      . . . But you don't disagree with your statement memo that you sent back in 2013 that a desirable distance would be six feet from the shoulder? And this is a clearance estimate that you gave, particularly with regard to rigid traffic signal poles.

A.      That's a desirable, but if you put it less than that, it wouldn't be a problem. It could be — an engineer could look at that and say, "I have decided I'm going one foot behind the edge of the shoulder."

Q.      Uh-huh (yes).

A.      Or two foot or six foot. He's got to make that call in the field, and that's what that memo says is that the goal is the desirable distance. But it's up to the engineer in the field to make that decision.

During the trial, Plaintiffs contended, through their expert and their cross-examination of DOTD's expert, that the 2003 Edition of MUTCD was the primary reference for standards and guidance applicable to DOTD for this project insofar as placement of the signal pole was concerned. Section 4D.19(B) of MUTCD provided the following guidance with regard to the lateral placement of signal poles: "Signal supports should be placed as far as practicable from the edge of the traveled way, without adversely affecting the visibility of the signal indicators." Plaintiffs further contended that the MUTCD chapter dealing with the lateral offset for sign supports, such as cantilevered, overhead sign supports similar to the cantilevered, mast-arm signal pole at issue, was applicable at least by analogy.

Section 2A.19 of MUTCD provided the following lateral offset standard for sign supports:

**For overhead sign supports, the minimum lateral offset from the edge of the shoulder (or if no shoulder exists, from the edge of the pavement) to the near edge of the overhead sign supports (cantilever or sign bridges) shall be 1.8 m (6 ft). Overhead sign supports shall have a barrier or crash cushion to shield them if they are within the clear zone**

14

While Section 2A.19 is located in the chapter pertaining to signs, Plaintiffs contended that it supplied guidance and should have been considered. The fact that the Allain Memo, six months prior to the accident, recognized that the desirable clearance for a signal pole on the type of roadway at issue was six feet, is highly relevant to Plaintiffs' position and their expert's opinion.

The Allain Memo is further relevant because Plaintiffs bore the burden of proving that DOTD knew or should have known of the defect in the thing causing damage. Mr. Allain's acknowledgement, six months prior to the accident, that the signal pole in question should optimally be placed six feet from the shoulder was proof of such knowledge. Proof of knowledge is an exception to the normal rule that subsequent remedial measures cannot be admitted. La.Code Evid. art. 407.

DOTD acknowledges in brief that although the Allain Memo may have been relevant, it should have been excluded as being too prejudicial rather than probative. However, any prejudice was caused by DOTD's own employee's subsequent admission. In *Juneau v. Strawmyer*, 94-903, p. 10 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1301 (alteration in original), the fourth circuit recognized that "[n]o one should be allowed to testify untruthfully in a court of law and then secure protection from exposure by claiming that evidence disclosing his lie is more prejudicial than probative." Therein the court determined that the trial court was correct in denying plaintiff's motion in limine as to the admissibility of a physician's prior testimony.

Similarly, no employee of a party should be allowed to deny a statement made pre-accident that is incongruent with later statements by the same employee by claiming the statement is too prejudicial. While the Allain Memo is in no way asserted to be a lie, it is at least, by inference, contrary to Mr. Allain's position and opinions as to the proper placement of the signal pole. Thus, it was not error for

15

the trial court to admit the Allain Memo into evidence. Simply put, its probative value outweighed any prejudicial effect it may have had, particularly given that Mr. Allain was able to testify and explain the meaning of the memo, which the jury was free to weigh and accept or reject as true. Nor do we find that the admission of this highly probative evidence resulted in confusion of the issues, the jury being misled, undue delay, or a waste of time. Thus, we find no abuse of discretion in the trial court's admission of the Allain Memo into evidence.

DOTD further argues that the Allain Memo, as well as the other materials, was specifically inadmissible pursuant to La.R.S. 48:35. This statute imposes a duty upon DOTD "to maintain, repair, construct, or reconstruct any public road, highway, bridge, or street, or any portion thereof, in a manner that is not unreasonably dangerous for a reasonably prudent driver." La.R.S. 48:35(E)(1)(a). It also provides that when a public road is constructed according to the "regulations or guidelines in effect on the date of approval by the chief engineer," it is presumed that the road was constructed "in a reasonably safe condition." La.R.S. 48:35(E)(1)(b). Louisiana Revised Statutes 48:35(E)(1)(c) provides that when a public road does not conform to the "regulations or guidelines established or adopted subsequent to the date of such approval of the original or amended design plan for the construction" of the public road, "such nonconformity shall not render any such public road . . . unreasonably dangerous or defective." It further provides:

> When determining whether or not an unreasonably dangerous condition exists . . . if a regulation or guideline is not directly applicable to the maintenance, repair, construction, or reconstruction, then evidence of failure to adhere to such regulation or guideline shall not be admissible in a court proceeding for any purpose.

La.R.S. 48:35(E)(2).

16

While we agree that the statutory language can apply hereto, its application specifically depends on whether the intersection was actually constructed by DOTD in accordance with the applicable guidelines. Here, the experts and witnesses for the parties disagree on this issue. Further, whether a particular standard, regulation, or guideline is directly applicable to the construction of the intersection and its features is also subject to debate and disagreement amongst the witnesses and experts. Thus, the proviso that such a standard "shall not be admissible in a court proceeding for any purpose[]" does not directly apply, and the trial court did not err in refusing to exclude the evidence on this basis.

*Assignment of Error Number Nine*

In its ninth assignment of error, DOTD argues the trial court's exclusion of a December 31, 2018 report by Dr. Charles Bettinger, Ms. Roach's forensic economist, interdicted the jury's fact-finding process by preventing it from making an informed decision on the issue of her loss of future earning capacity. In the report, Dr. Bettinger projected Ms. Roach's future loss of earning capacity at $308,556.00.[7] DOTD claims that because this report was excluded, the only information the jury heard was Dr. Bettinger's deposition testimony that Ms. Roach's future loss of earning capacity would range between $744,000.00 and $1,150,000.00, depending on whether she was employed as a dental assistant or a dental hygienist.[8]

---

[7] Although DOTD states that Dr. Bettinger's December 31, 2018 report determined that Ms. Roach's loss of future earning capacity was $377,454.00, the report actually determined that this amount was $308,556.00. The report determined that her total loss of earning capacity, past ($68,898.00) and future ($308,556.00) equaled $377,454.00.

[8] At the time of trial, Ms. Roach was working as a waiter. Prior to the accident, she had completed a dental-assistant course and was to begin working in that field the Monday following the accident. She further planned to attend and attain dental-hygienist degree from Lamar University before working as a dental hygienist.

17

During his trial deposition, Dr. Bettinger testified that Ms. Roach's lost wages amounted to $153,062.00 because she was scheduled to begin working as a dental assistant the Monday after the accident. Because she was working as a waitress at the time of trial, he determined that she suffered a future loss of earning capacity of either $744,510.00, based on her future dental-assistant earnings, or $1,151,774.00, based on her future dental-hygienist earnings. Dr. Bettinger testified that he based these amounts on annual-earning figures provided by Jeff Peterson, Ms. Roach's vocational evaluation expert.[9]

During cross examination, DOTD questioned Dr. Bettinger about his previous December 31, 2018 report, in which he concluded that Ms. Roach's pre-accident earning capacity was $27,475.00; her post-accident earning capacity was $18,500.00; her past lost earnings was $68,898.00; her loss of future earning capacity was $308,556.00; and her total past and future loss of earning capacity was $377,454.00.

Counsel for Ms. Roach objected to these questions, arguing that the December 31, 2018 report was offered as part of settlement negotiations. Dr. Bettinger explained that this was a preliminary report compiled at the request of Ms. Roach's counsel, who was "trying to get . . . a ballpark figure to determine what . . . he would put in his – I guess you call it 'demands.'" He stated that at the time he issued the report, he did not have Mr. Peterson's report; thus, he was asked to make certain assumptions regarding Ms. Roach's future loss of earning capacity based on information provided by her counsel. Dr. Bettinger further testified that although he relied on these assumptions for his preliminary report, he would not

---

[9] Mr. Peterson determined the annual salary for waitress ($20.800.00), dental assistant ($33,200.00) and dental hygienist ($55,000.00).

18

have used that information as the basis for his trial testimony. He stated that his May 4, 2019 report was based on the information provided by Mr. Peterson.

Following a hearing on the issue, the trial court noted DOTD's objection to the exclusion of the evidence, but ordered, "As to the matter of the portions of the deposition that Mr. Barrett has objected to in Dr. Bettinger's deposition, all portions that relate to the report from 2018 are to be redacted and removed." DOTD proffered an unredacted copy of Dr. Bettinger's deposition into evidence.

In *Vaughn v. Progressive Security Insurance Co.*, 03-1105, pp. 3-4 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207, 1213-14, this court stated, with regard to appeal of evidentiary rulings:

> The standard of review for evidentiary rulings of a trial court is abuse of discretion. *Johnson v. First Nat'l Bank of Shreveport*, 00-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, *writs denied*, 01-2770, 01-2783 (La.1/4/02), 805 So.2d 212, 213. If a trial court has committed error in its evidentiary rulings such that the jury verdict is tainted by the errors, the appellate court should conduct a *de novo* review. *Evans v. Lungrin*, 97-541, 97-577 (La.2/6/98), 708 So.2d 731; *McLean v. Hunter*, 495 So.2d 1298 (La.1986).
>
> In *Evans*, the supreme court stated: "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Evans*, 708 So.2d at 735. Under *Evans*, a *de novo* review should not be undertaken for every evidentiary exclusion error but should be limited to "consequential errors," which are errors that "prejudiced or tainted the verdict rendered." *Wingfield v. State ex. rel. Dep't of Transp. and Dev.*, 01-2668, 01-2669, p. 15 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 799, *writs denied*, 03-313, 03-339, 03-349 (La.5/30/03), 845 So.2d 1059, 1060, *cert. denied*, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003).
>
> If we determine that a *de novo* review is not required here, we must review the jury's findings under the manifest error/clearly wrong standard of review which provides that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). To reverse a jury's finding, we must find from the record that a reasonable factual basis does not exist for the finding and, further, that the finding is clearly wrong. *Id.*

Louisiana Code of Evidence Article 408(A) provides, with regard to civil cases:

> In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, anything of value in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This Article does not require the exclusion of any evidence otherwise admissible merely because it is presented in the course of compromise negotiations. This Article also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The 1988 comments to Article 408 state, "This Article generally follows Federal Rule of Evidence 408[,]" which provides:

> **(a) Prohibited Uses.** Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > **(1)** furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > **(2)** conduct or a statement made during compromise negotiations about the claim--except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.
>
> **(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The purpose behind Federal Rule of Evidence 408 was exhaustively discussed in *E.E.O.C. v. UMB Bank Financial Corp.*, 558 F.3d 784, 791 (8th Cir. 2009) (alteration in original), as follows:

> The spirit of the Rule, as recognized by several circuits and as set forth in the commentary to the Rule, supports the exclusion of certain work product, internal memos, and other materials created

20

specifically for the purpose of conciliation, even if not communicated to the other party. *See* Advisory Committee Notes on Fed.R.Evid. 408 (stating the purposes of the rule are to foster open discussions and out-of-court settlements and to guard against the admission of evidence that may not fairly represent the actual value or merits of a claim, including not just offers, but "expansion of the rule . . . to include evidence of conduct or statements made in compromise negotiations, as well as the offer or completed compromise itself"); *id.* (stating that the Rule applies to evidence for both parties as "[t]he protections of Rule 408 cannot be waived unilaterally because the rule, by definition, protects both parties from having the fact of negotiation disclosed to the jury"); *Affiliated Mfrs., Inc. v. Alum. Co. of Am.*, 56 F.3d 521, 528-30 (3d Cir.1995) (holding that Rule 408 applies to internal memoranda regarding compromise negotiations even though not communicated to the opposing party); *Blu-J, Inc. v. Kemper C.P.A. Group*, 916 F.2d 637, 641-42 (11th Cir.1990) (holding that an accountant's report prepared for the purpose of compromise negotiations was properly excluded); *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106-07 (5th Cir.1981) (holding an internal report made "in the course of an effort to compromise" was properly excluded under Rule 408). We find the commentary and these cases persuasive, and we agree that it is appropriate to view Rule 408 as being sufficiently broad to encompass certain material in addition to actual offers of settlement.

In *Lyondell Chemical Co. v. Occidental Chemical Corp.*, 608 F.3d 284, 295 (5th Cir. 2010) (footnote omitted), the fifth circuit stated:

By its terms, Rule 408 protects only "conduct or statements made in compromise negotiations" regarding "a claim that was disputed as to validity or amount." This protection extends to legal conclusions, factual statements, internal memoranda, and the work of non-lawyers and lawyers alike so long as the communications were "intended to be part of . . . negotiations toward compromise."

At issue in *Ramada Development Co. v. Rauch*, 644 F.2d 1097 (5th Cir. 1981), was a report by an architect, which Ramada utilized in its unsuccessful settlement negotiations with the defendant. The report studied the defects identified by the defendant in the project Ramada had contracted to design, construct, and furnish. The court stated that the purpose of "[t]he report was to identify arguable defects that could then be discussed in monetary terms in the negotiations." *Id.* at 1107. In affirming the exclusion of the report, the court stated, "The Goldsmith report, as described by Mr. Gilbert, thus represents a collection of

21

statements made in the course of an effort to compromise, and the district court properly held it inadmissible under the main provision of rule 408." *Id.*

Based on Dr. Bettinger's testimony, we find that he prepared the December 31, 2018 report so that counsel for Ms. Roach could use the compiled damage amounts as the basis for her economic losses in settlement negotiations with DOTD. As in *Ramada*, we find that the report is a collection of statements made by Dr. Bettinger in the course of Ms. Roach's effort to compromise her claim with DOTD. Accordingly, we find that the trial court did not abuse its discretion in excluding the evidence.

### *Assignment of Error Number Three*

In its third assignment of error, DOTD argues the trial court improperly granted a directed verdict in favor of Plaintiffs on the issue of Hannah's fault.

In *McNabb v. Louisiana Medical Mutual Insurance Co.*, 03-565, 03-596, p. 12 (La.App. 3 Cir. 11/5/03) 858 So.2d 808, 816-17, *writs denied*, 03-3344, 03-3339 (La. 2/13/04), 867 So.2d 701, 702, this court laid out the law pertaining to directed verdicts:

> Louisiana Code of Civil Procedure Article 1810 provides that a party may move for a directed verdict at the close of evidence. A directed verdict is appropriately granted in the event that "facts and inferences are so overwhelmingly in favor of the moving party that the court finds that reasonable men could not arrive at a contrary verdict." *Guste v. Nicholls Coll. Found.*, 564 So.2d 682, 688-89 (La.1990). On review, an appellate court also considers whether the evidence submitted indicates that reasonable triers of fact would be unable to reach a different verdict. *Pratt v. Himel Marine, Inc.*, 01-1832 (La.App. 1 Cir. 6/21/02), 823 So.2d 394, *writ denied*, 02-2128 (La.11/1/02), 828 So.2d 571, *writ denied*, 02-2025 (La.11/1/02), 828 So.2d 572. *Cobb v. Kleinpeter*, 95-271 (La.App. 3 Cir. 10/4/95), 663 So.2d 236, *writ denied*, 95-2683 (La.1/12/96), 666 So.2d 323. The court of appeal considers the evidence under the substantive law applicable to the nonmoving party's claim. *Frazier v. Zapata Protein USA, Inc.*, 02-0605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141, *writ denied*, 03-0145 (La.3/21/03), 840 So.2d 537, *writ denied*, 03-0126 (La.3/21/03), 840 So.2d 539.

22

"The negligence of a driver is not imputed to her guest passenger, who ordinarily has virtually no control over the actions of the driver." *Doucet v. Hornet Serv. Co.*, 19-212, p. 11 (La.App. 3 Cir. 11/20/19), 314 So.3d 23, 32, *writ denied*, 19-2022 (La. 2/26/20), _ So.3d _. However, as pointed out in *Robinette v. Old Republic Insurance Co.*, 17-79, pp. 5-6 (La.App. 3 Cir. 10/4/17), 229 So.3d 61, 65-66, *writ denied*, 17-1871 (La. 1/9/18), 231 So.3d 648, Louisiana law has imposed passenger fault in "special and out-of-the-ordinary situations[,]" such as "where there is a joint venture, an independent negligent act by the passenger, or a showing that the rider had actual or constructive knowledge of a driver's incompetence or impaired ability to operate the vehicle."

The supreme court, in *Molbert v. Toepfer*, 550 So.2d 183, 186 (La.1989), expounded on the law pertaining to guest passenger comparative fault:

> Recently in *Murray v. Ramada Inns, Inc.*, 521 So.2d 1123 (La.1988), this court determined that assumption of risk is no longer a viable legal concept in Louisiana tort law. We concluded that a plaintiff's conduct should be assessed on the basis of civilian concepts of comparative fault and duty-risk. *Id.* at 1132. Therefore, we assess the plaintiff's conduct within the general scheme of comparative negligence, assigning liability to the plaintiff in proportion to his fault. *Id.* at 1133-34. *See also Bufkin v. Mid-American Indemnity Co.*, 528 So.2d 589 (La.App. 2d Cir.1988); *Townley v. Manuel*, 509 So.2d 515 (La.App. 3d Cir.1987); and *Gravois v. Succession of Trauth*, 498 So.2d 140 (La.1986), *writ denied*, 500 So.2d 422 (La.1987) (applying comparative negligence rather than assumption of risk when a guest passenger is injured while riding with an intoxicated driver).
>
> In *Prestenbach v. Sentry Insurance Company*, 340 So.2d 1331, 1334 (La.1976), we summarized the law pertaining to a guest passenger injured while riding with an intoxicated driver:
>
>> The law is well settled that a guest passenger riding with a driver who has been drinking excessively assumes the risk of injuries received in an accident caused in whole or in part by the driver's negligence, if the alcohol-induced impairment of the driver's ability is a substantial contributory cause of the driver's negligence and if the guest passenger *knows* or *should have known* of the driver's condition and nevertheless voluntarily rides with him. *Marcotte v. Travelers Ins. Co.*, 258 La.

23

989, 249 So.2d 105 (1971); *Jones v. Continental Casualty Co.*, 246 La. 921, 169 So.2d 50 (1964).

Now, since the Legislature's revision of the contributory negligence statute and our decision in *Murray v. Ramada Inns*, "the fact that the plaintiff may have been aware of the risk created by the defendant's conduct should not operate as a total bar to recovery." *Murray*, 521 So.2d at 1134. Instead, the plaintiff's appreciation of the danger is among the factors to be considered in assessing percentages of fault. *Id.*

The party asserting the affirmative defense of comparative fault bears the burden of proving the defense by a preponderance of the evidence. *Guidry v. Beauregard Elec. Coop., Inc.*, 14-1108 (La.App. 3 Cir. 4/8/15), 164 So.3d 266, *writs denied*, 15-900, 15-903 (La. 9/11/15), 176 So.3d 1038.

The parties stipulated that Mr. Adams' post-accident BAC was 0.13%. Dr. Wimbish testified that based on Mr. Adams' BAC, he was intoxicated at the time of the accident and that he would have experienced delayed perception and reaction times, sleepiness, drowsiness, slurred speech, and blurred vision or an inability to focus properly.

The only two witnesses who testified regarding the events that occurred prior to the accident were Ms. Roach and Mr. Adams. Ms. Roach testified that she and Hannah met up with Mr. Adams in the parking lot as they were leaving OB's Bar and Grill at approximately 4:00 a.m. and that he ended up leaving with them in Hannah's vehicle. Ms. Roach stated that although Hannah was initially driving, she had Mr. Adams change places with her after she nearly drove into a ditch and then almost backed into a gully while trying to leave the parking lot. Ms. Roach testified that she "didn't feel comfortable leaving the parking lot with her driving. And I made the wrong choice thinking, you know, that they should switch because it – it – to me Ryan did look like he was in a better state to drive then she did. So I told them to switch." She stated that once Mr. Adams and Hannah switched places,

24

she noticed no problems with Mr. Adams' ability to drive. She stated that she then fell asleep in the back seat and only woke up when she was in the ambulance following the accident. She said that she did not remember seeing Mr. Adams in the bar nor did she know if he had been drinking prior to their meeting. She further stated that she never saw him with a drink in his hand before they left the parking lot.

Mr. Adams admitted that he was driving Hannah's vehicle when the accident occurred and that he was intoxicated at the time. He stated that he began drinking prior to arriving at OB's at approximately 11:30 p.m., and he continued drinking after his arrival. However, he could not recall why he left with Ms. Roach and Hannah or how he came to be driving Hannah's vehicle.

Subsequent to Plaintiffs' argument on the directed verdict, counsel for DOTD stated:

> Your honor, we didn't know what the trial would bring. We didn't know what the evidence would have shown until its [sic] come out.
>
> The only person who remembered anything was Victoria Roach, and she didn't have anything to say about Hannah McVey or her ability – what Hannah may have known or not known about Mr. Adams.
>
> Mr. Adams remembered nothing. I'm a practical person, I understand that Ms. McVey cannot put [sic] on the jury verdict form.

Following this statement, the trial court granted the motions for directed verdict on the issue of Hannah's fault in favor of Plaintiffs.

After reviewing the evidence in light of the applicable substantive law, we conclude that reasonable persons would be unable to reach a verdict finding that Hannah was comparatively at fault for riding with Mr. Adams after they left the bar. Ms. Roach and Hannah met up with Mr. Adams shortly before leaving OB's parking lot, and the accident occurred approximately sixteen minutes later.

25

Although there is no evidence indicating whether Hannah knew Mr. Adams was intoxicated, the record establishes that Ms. Roach made the decision that he would drive based on her determination that Hannah was incapacitated. Moreover, Ms. Roach denied knowing that Mr. Adams was intoxicated. She never saw him in the bar or saw him drinking before they left the parking lot. Accordingly, the judgment of the trial court granting directed verdicts in favor of Plaintiffs is affirmed.

## *Assignments of Error Numbers Four, Six, Seven, and Eight*

In its eighth assignment of error, DOTD asserts that the jury erred in determining that it was twenty percent at fault for the accident and resulting injuries. Additionally, in its fourth, sixth, and seventh assignments of error, DOTD argues that the jury erred by imposing a duty on it to protect against the harm caused by a highly intoxicated motorist, such as Mr. Adams, and by requiring it to go above and beyond its mandate to follow the applicable editions of MUTCD and AASHTO. DOTD further argues that the jury erred by finding that an unreasonable risk of harm existed and by finding it liable despite a lack of evidence establishing that it knew or should have known of a defect that posed an unreasonable risk of harm. As each of these alleged errors relate to the ultimate issue of DOTD's liability, we will address them together.

Herein, we must determine whether the jury was manifestly erroneous or clearly wrong in its determination that DOTD was twenty percent at fault. An allocation of fault is a factual determination by the trier of fact that is owed some deference. Thus, on appeal, a jury's allocation of fault is subject to the manifest error/clearly wrong standard of review. *Clement v. Frey*, 95-1119, 95-1163 (La. 1/16/96), 666 So.2d 607.

26

DOTD has a duty to maintain the public roadways, including adjacent shoulders and areas in the DOTD's right of way, in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. *Campbell v. State, Through Depart. of Transportation and Development*, 1994-1052, p. 6 (La.1/17/95), 648 So.2d 898, 901-902; *Brown v. Louisiana Indem. Co.*, 1997-1344 p. 3 (La.3/4/98), 707 So.2d 1240, 1242; *Oster v. Dept. of Transp. & Development*, 582 So.2d 1285, 1289-91 (La.1991). This duty, however, does not render DOTD the guarantor for the safety of all of the motoring public or the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. *Netecke v. State ex rel. DOTD*, 1998-1182, 1998-1197 p. 8 (La.10/19/99), 747 So.2d 489, 495. Further, this court has held that DOTD's failure to design or maintain the state's highways to modern standards does not establish the existence of a hazardous defect in and of itself. *Myers v. State Farm Mut. Auto. Ins. Co.*, 493 So.2d 1170, 1173 (La.1986). Whether DOTD has breached its duty to the public depends on all the facts and circumstances determined on a case by case basis. *Campbell*, 1994-10522 p. 6, 648 So.2d at 901-902.

. . . .

A reviewing court should afford considerable weight to an administrative agency's construction and interpretation of its rules and regulations adopted under a statutory scheme that the agency is entrusted to administer, and its construction and interpretation should control unless they are found to be arbitrary, capricious, or manifestly contrary to its rules and regulations. *See, Dixie Electric Membership Corp. v. Louisiana Public Service Comm'n.*, 441 So.2d 1208, 1211 (La.1983); *see, also, In the Matter of Recovery I, Inc.*, 1993-0441 (La.App. 1st Cir.4/8/94), 635 So.2d 690, 696, *writ denied*, 1994-1232 (La.7/1/94), 639 So.2d 1169.

*Forbes v. Cockerham*, 08-762, pp. 31-33 (La. 1/21/09), 5 So.3d 839, 858-59.

In a roadway design-defect case such as this, a plaintiff must prove four

elements in order for DOTD to be held liable:

(1) DOTD had custody of the thing which caused plaintiffs' damages, (2) the thing was defective because it had a condition which created an unreasonable risk of harm, (3) DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and (4) the defect was a cause-in-fact of plaintiffs' injuries.

*Boothe v. Dep't of Transp. & Dev.*, 18-1746, p. 7 (La. 6/26/19), 285 So.3d 451, 456.

The existence of an unreasonable risk of harm may not be inferred solely from the fact that an accident occurred. In fact, the vice or defect must be of such a nature as to constitute a dangerous condition that would be reasonably expected to cause injury to a prudent person using ordinary care under the circumstances. *Lasyone v. Kansas City Southern R.R.*, 2000-2628 p. 8 (La.4/3/01), 786 So.2d 682, 690.

This court has previously described the unreasonable risk of harm criterion as a guide in balancing the likelihood and magnitude of harm against the social utility of the thing, all the while considering a broad range of social and economic factors, including the cost to the defendant of avoiding the harm, as well as the risk and the social utility of the party's conduct at the time of the accident. *Netecke*, 1998-1182, 1998-1197 p. 14-15, 747 So.2d at 498. In every determination, all the circumstances surrounding the particular accident under review must be considered to determine whether DOTD's legal duty encompassed the risk which caused the plaintiff's damages. *Oster*, 582 So.2d at 1289.

*Forbes*, 5 So.3d at 859-60 (footnote omitted).

The liability of DOTD, as a public entity, is based on an extension of La.Civ. Code art. 2317's principle that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." However, the liability of a public entity pursuant to Article 2317 is tempered by the application of La.R.S. 9:2800(C), which provides:

[N]o person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

There is no dispute that DOTD had custody of the intersection where this accident occurred, as it designed and constructed the roadway. Thus, the first prong of the test is met. Next, we look to whether the intersection, including the placement of the signal pole, was defective because of the existence of a condition that created an unreasonable risk of harm; whether DOTD had actual or

28

constructive notice of the defect and failed to take corrective measures within a reasonable amount of time; and whether the defect was a cause-in-fact of Plaintiffs' injuries and damages. In finding DOTD twenty percent at fault, the jury answered these questions in the affirmative. After a thorough review of the testimony presented at trial, both for and against DOTD, we find no manifest error in those decisions.

### *Highway 385*

The roadway at issue, Hwy 385, which runs north and south from upper Cameron Parish to Lake Charles, Calcasieu Parish, was originally a two-lane road, consisting of two twelve-foot travel lanes and five to seven-foot aggregate shoulders. It was classified by DOTD as a rural roadway. In the 1970s, DOTD initiated a project to widen Hwy 385 into a five-lane urban roadway. However, due to funding issues, a section of roadway, including the intersection at issue, was separated from the original project, becoming Project No. 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. The design for this project originally intended to widen the roadway into a rural major collector, with four twelve-foot travel lanes and a depressed median.

Due to time and budget constraints, the design engineer sought a design exception to change the design from a rural major collector to an urban arterial 2 (UA2), consisting of four twelve-foot travel lanes, a fourteen-foot center and left-turn lane, and ten-foot shoulders. The revised plans were approved by William Temple, DOTD's chief engineer, on January 24, 2008, and the contract was let for bidding on June 17, 2009, with the contract being let to Gilchrist Construction Company, LLC on July 21, 2009. A final inspection of the constructed roadway was performed by DOTD on June 8, 2011, with DOTD's final acceptance of the roadway occurring on June 10, 2011.

29

During construction of the traffic signal located at the intersection of Hwys 385 and 3092, DOTD installed a rigid signal pole with a fifty-five-foot cantilevered mast arm in each quadrant of the intersection. The signal pole at issue is located in the southwest quadrant of the intersection. At this location, the shoulder is ten-feet wide, and the signal pole's concrete foundation is located four feet from the shoulder and fourteen feet from the travel lane, which is the outer white line or fog line. The foundation is thirty-six inches in diameter and because it is located in the foreslope of the ditch, extends fourteen inches above the ground on the side closest to the roadway and twenty-one inches above the ground on the side furthest from the roadway.

*Applicable Design Guidance*

The design guidance relative to signal-pole placement, in effect when the plans for the project were approved, was developed either nationally or by DOTD. The national guidance contained in MUTCD (2003), the RDG (2002), a Policy on Geometric Design of Highways and Streets (2004) (GDHS), and a July 25, 1997 Federal Highway Administration (FHWA) memorandum (Federal Memo), provided, in part, as follows:

**MUTCD**

**Part 4. HIGHWAY TRAFFIC SIGNALS**

**CHAPTER 4D. TRAFFIC CONTROL SIGNAL FEATURES**

**Section 4D.19  Lateral Placement of Signal Supports and Cabinets**

Guidance:

The following items should be considered when placing signal supports and cabinets:

A.  Reference should be made to the American Association of State Highway and Transportation Officials (AASHTO) "Roadside Design Guide" (see Section 1A.11) and to the "American with

30

Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG)" (see Section 1A.11).

B.   Signal supports should be placed as far as practical from the edge of the traveled way without adversely affecting the visibility of the signal indications.

Where supports cannot be located based on the recommended AASHTO clearances, consideration should be given to the use of appropriate safety devices.

No part of a concrete base for a signal support should extend more than 100 mm (4 in) above the ground level at any point. This limitation does not apply to the concrete base for a rigid support.

. . . .

D.   Controller cabinets should be located as far as practical from the edge of the roadway.

**RDG**

**Chapter 4**

**Sign, Signal, and Luminaire Supports, Utility Poles, Trees, and Similar Roadside Features**

## 4.6   SUPPORTS FOR TRAFFIC SIGNALS AND MISCELLANEOUS TRAFFIC SERVICE DEVICES

### 4.6.1   TRAFFIC SIGNALS

Traffic signal posts present a special situation where a breakaway support may not be practical or desirable. As with luminaire supports, a fallen signal post may become an obstruction. However, the potential risks associated with the temporary loss of full signalization at the intersection should be considered.

When traffic signals are installed on high-speed facilities (generally defined as those having speed limits of 80 km/h [50 mph] or greater), the signal supports, and the signal support box if not mounted on one of the signal support poles, should be placed as far away from the roadway as practicable. Shielding these supports can be considered if they are within the clear zone for that particular roadway. Consideration should be given to using breakaway supports for post-mounted signals installed in wide medians.

**GDHS**

**Foreword**

31

. . . .

The intent of this policy is to provide guidance to the designer by referencing a recommended range of values for critical dimensions. It is not intended to be a detailed design manual that could supersede the need for the application of sound principles by the knowledgeable design professional. Sufficient flexibility is permitted to encourage independent designs tailored to particular situations. Minimum values are either given or implied by the lower value in a given range of values. The larger values within the ranges will normally be used where the social, economic, and environmental (S.E.E.) impacts are not critical.

**Cross Section Elements**

**Horizontal Clearance to Obstructions**

The term "clear zone" is used to designate the unobstructed, relatively flat area provided beyond the edge of the traveled way for the recovery of errant vehicles. The clear zone includes any shoulders or auxiliary lanes.

The AASHTO *Roadside Design Guide* (10) discusses clear-zone widths as related to speed, volume, and embankment slope. The Guide may be used as a reference for determination of clear-zone widths for freeways, rural arterials, and high-speed rural collectors. For low-speed rural collectors and rural local roads, a minimum clear-zone width of 3.0 m [10 ft] should be provided.

For urban arterials, collectors, and local streets where curbs are utilized, space for clear zones is generally restricted. A minimum offset distance of 500 mm [18 in] should be provided beyond the face of the curb, with wider offsets provided where practical. This "operational" offset will generally permit curbside parking and will not have a negative impact on traffic flow. However, since most curbs do not have a significant capability to redirect vehicles, a minimum clear-zone distance commensurate with prevailing traffic volumes and vehicle speeds should be provided where practical.

**FEDERAL MEMO**

- Exceptions [to crashworthy requirement]:

  . . . .

  6. Traffic signal supports and utility poles are exempt from the crashworthiness requirements being addressed here. Actually breakaway utility poles are expressly covered in the NCHRP Report 350 and guidelines for testing breakaway sign and luminaire supports could reasonably be applied to traffic signal supports. Nevertheless,

32

because of the structural requirements for utility poles and most traffic signal supports, the technical problems with making them breakaway, and the assumed net benefit to the public from allowing them, unshielded, within the clear zone, a requirement that they be made breakaway, historically, has not been imposed on them. On the other hand, they constitute real risks for motorists and all practicable measures should be taken through their location or a reduction in their numbers to reduce their risk to motorists. In addition, because of their low structural requirements, consideration should be given to making post-top-mounted traffic signal supports breakaway.

DOTD's guidance was developed in accordance with La.R.S. 48:35(A), which provided:

The Department of Transportation and Development shall adopt minimum safety guidelines with respect to highway and bridge design, construction, and maintenance. These guidelines shall correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials allowing the flexibilities incorporated therein. Hereafter, the state highway system shall conform to such safety guidelines.

The design guidance adopted pursuant to La.R.S. 48:35(A) was contained in the TSDM (2002), the Louisiana Standard Specifications for Roads and Bridges (2006) (SSRB), and the Traffic Signal and Installation Details (Signal Details) inserted in the construction plans. These provided, in part:

**TSDM**

**1.5    Pole Location**

. . . .

**1.5.3 Minimum Clearances** – On uncurbed roadways, it is desirable that poles be located a minimum of 6 feet outside the roadway shoulder or 12 feet outside the edge of the travelway. On curbed roadways poles shall be located no closer than 2 feet to the front of the curb. In any case, signal poles should be located as far as practical from the edge of the travel lane without adversely affective signal visibility. (Footnotes omitted.)

33

. . . .

**2.0 Mast Arms** – Where used on LA DOTD signal installations, mast arms shall be in accordance with current LA DOTD standard details.

. . . .

**2.7 Mast Arm Pole Location** – The requirements for locating mast arm poles are the same as those listed for the location of strain poles (See paragraph 1.5 of this section).

## SSRB

## 736.04 GENERAL REQUIREMENTS.

. . . .

Minimum clearances for traffic signal supports and apparatus shall be in accordance with the MUTCD. Poles shall be located a minimum of 24 inches (600 mm) outside the shoulder or a minimum of 10 feet (3 m) outside the edge of the travelway whichever is greater.

## SIGNAL DETAILS

### NO. 5 HORIZONTAL CLEARANCE

A.  Minimum clearances for traffic signal supports are apparatus shall be located in accordance with the current adopted edition of the MUTCD.

B.  In rural areas or uncurbed urban areas, the required poles shall be located as far as practicable beyond the pavement edge. A minimum clearance of 2 feet outside the shoulder or a minimum clearance of 10 feet outside the pavement edge, whichever is greater, shall be provided.

C.  In curbed areas, poles shall be placed as far as practicable from the edge of the travel lane. A minimum clearance of 2 feet behind [the] curb shall be maintained.

. . . .

### NO. 12 RIGHT-OF-WAY

A.  The contractor shall be responsible for working within the right-of-way limits.

B.  The right-of-way limits shown on the plans is not guaranteed to be accurate. A thorough right-of-way investigation is recommended to be done by the user agency prior to

34

construction of these plans to determine if additional right-of-way is required.

. . . .

## NO. 16  SIGNAL EQUIPMENT LOCATION

A.  Locations of poles, signals, loop detectors, system sensors, controllers and junction boxes are approximate. Exact location shall be approved by the project engineer.

B.  The contractor shall stake the location of each pole foundation and notify the project engineer for concurrence in the location before proceeding with the installation of the pole foundation.

C.  Once the pole foundation is installed, mast arm lengths specified on plans are to be verified to order the materials. If a time extension is needed, it shall be at the discretion of the project engineer to grant the extension.

. . . .

## NO. 18  SIGNAL POLE HEIGHT

A.  The contractor shall provide heights that are sufficient to ensure that the bottom of the lowest signal on an assembly is not less than 17' above the pavement. For maximum height refer to the MUTCD, current adopted edition.

B.  Signal head alignment and clearance shall be in accordance with the LADOTD Signal Manual.

. . . .

## NO. 22  STANDARDS

A.  All work shall conform to LADOTD's latest edition of their Standard Specifications for Roads and Bridges, and the project special provision specifications.

B.  All signs, signal, pavement markings and temporary traffic control devices are to conform to the Manual on Uniform Traffic Control Devices (MUTCD) (Millennium Edition and all subsequent adopted revisions).

. . . .

## NO. 25 UTILITIES, UNDERGROUND

A.  Underground utilities may exist in the construction areas. The location and type shown is not guaranteed to be accurate nor all

inclusive. The information is shown solely for use in establishing design controls for the project. The engineer does not guarantee accuracy or guarantee that all utilities are shown.

B.    Before any excavations, the contractor shall contact "Louisiana One Call", the appropriate utility company, and LADOTD Traffic Services . . . for location of the underground service a minimum of 48 hours prior to beginning construction. The "Louisiana One Call" number is . . . .

C.    The contractor shall be responsible for determining the exact location, depth, and size of all underground utilities and structures and shall be liable for any damages caused by failure to comply with these instructions. The contractor shall also be responsible for making independent investigations, including any subsurface investigations as necessary at no expense to the department.

*Testimony*

Doug Robert, Plaintiffs' forensic engineer, testified that the southwest quadrant of the intersection was defective due to the shoulder and ditch design and the location of the signal pole and its foundation. He stated that because the ditch began at the edge of the shoulder, the signal pole was located in the ditch's foreslope, approximately four feet from the shoulder. Mr. Robert opined that the foreslope, with a slope of 1:4,[10] was too steep, and a better slope would have been 1:6. While he admitted that slope is important for drainage purposes, he testified that in this case, the foreslope's steepness and the signal pole's location increased the risk that a vehicle leaving the roadway would be pulled into the signal pole. He stated that this would be a safety objective for a design engineer when placing an immovable object within this area. He said that the shoulders in the other three quadrants were more acceptable because the signal pole locations in those areas were more level than the one at issue.

Mr. Robert testified that because DOTD completely redesigned the ditches during construction of the roadway, it could have leveled the area where the signal

---

[10] This equates to one foot of vertical rise for every four feet of horizontal run.

pole was located by extending the drainage pipes located under Highway 3092 and filling in the ditch. He stated that this would have allowed the signal pole to be located a further two feet, for a total of six feet, from the shoulder. He opined that because the signal pole was impacted by less than two feet of the vehicle's right-front quadrant, the accident would not have occurred if the signal pole had been located a further two feet west.

Mr. Robert testified that leveling this area would also have resulted in less exposure of the signal pole's foundation. He stated that because the foundation was located in the foreslope, it extended above the ground fourteen inches on one side and twenty-one inches on the other side. He opined that generally, a foundation should not extend this far above the ground, and according to DOTD's plans, it should have extended no more than four inches above the ground. Mr. Robert agreed that it was necessary for the foundation to extend above the ground in order to prevent the traffic signal's electrical connections, located at the base of the signal pole, from getting wet. He further opined that because most vehicles have a clearance of six inches, a vehicle passing near a signal pole would clear a foundation that only extended four inches above the ground. He added that a foundation that extended twenty-one inches above the ground was impractical because it presented a large target.

Both the 2003 and 2009 editions of MUTCD limit a signal pole's foundation from extending more than four inches above the ground, unless the signal pole was a rigid pole. However, Mr. Robert testified that this exception was inapplicable in this instance because of language from DOTD's plans, which stated, "4 [inch] minimum between ground and top of foundation or as directed by the project engineer[.]" He interpreted this to mean that a foundation cannot extend more than four inches above the ground. However, he admitted that a project engineer would

37

have flexibility when constructing a foundation based on the phrase "or as directed by the project engineer."

Mr. Robert testified that the location of the signal pole was defective because DOTD failed to consider the use of safety devices in order to mitigate against the danger presented by its location in the clear zone. He stated that the RDG[11] described the clear zone as "'an unencumbered roadside recovery area that is as wide as practical on a specific highway section[,]'" based on a roadway's traffic volume, speed, and roadside geometry. Thus, Mr. Robert opined that Hwy 385 was required to be clear of obstacles for thirty feet from the travel lane, and any object located within the clear zone was required to be either forgiving or shielded. He explained that a forgiving object is a breakaway object, and a shielded object is one that deflects vehicles through guardrails, impact attenuators (crash cushion), or other means. While Mr. Robert admitted that the RDG provided only guidance, he asserted that pursuant to La.R.S. 48:35(A), DOTD's minimum safety guidelines had to conform to AASHTO's safety guidelines. He further stated that while AASHTO allowed DOTD flexibility in the design and construction of roadways, it was not exempt from the RDG's mitigation requirements relative to obstructions located within the clear zone.

Mr. Robert testified that even though the Federal Memo declared that non-breakaway signal poles were exempt from being crashworthy, it did not exempt them from the clear zone mitigation requirements. Thus, he opined that DOTD should have considered either relocating the signal pole or using mitigation techniques, such as a guardrail, impact attenuator, or rumbles strips. He testified that there was no evidence that the project engineer, Mr. Duberville, considered

---

[11] The RDG provides a hierarchy of design options pertaining to fixed objects located within the clear zone: removal, redesign, relocation, reduction of severity (breakaway device or impact attenuator), shielding (guardrail), or delineation.

38

placing the signal pole in any other location once he determined its final placement within the clear zone.

Even though Mr. Robert opined that DOTD should have considered placing a guardrail in front of the signal pole, he admitted that its policy allowed the use of non-shielded, rigid (non-breakaway) signal poles on the state highway system. The policy, which was contained in the Allain Memo, stated:

> Intersections have frequent crashes and therefore have a high amount of errant vehicles paths [sic] at all angles. Utilizing guardrail to shield objects is a common practice, but it is not practicable to shield signal supports at intersections. Guardrails primarily function to run parallel to the roadway and to redirect errant vehicles away from objects. However, intersections typically have traffic flows which runs perpendicular to each other such that the guardrail would be parallel to one direction of traffic and perpendicular to the other. As such, guardrail would be ineffective and may even be detrimental when struck at a perpendicular angle. In addition, guardrail at a perpendicular angle presents a very large area for these errant vehicles to hit. Based on the above, the use of guardrails around signal supports is not recommended.

Mr. Robert testified that this passage simply meant that DOTD was not strong on the use of guardrails at intersections; thus, the design engineer should have considered the use a guardrail, or if inappropriate, another mitigation technique. However, he admitted, based on his inspection of the intersection, that there was insufficient room at the intersection for placement of a guardrail adjacent to the signal pole. He stated that the only way a guardrail would work was if DOTD extended the drainage culverts located under Hwy 3092 and filled in the ditch to level the area adjacent to the shoulder. He did admit, however, that the primary reason DOTD changed Hwy 385's design from a major rural collector to a UA2 roadway was its limited right-of-way.

Mr. Robert testified that a further reason the signal pole was defective was because it was located less than six feet from the shoulder. He stated that in addition to the clear zone concept, DOTD should have considered MUTCD, the

39

TSDM, DOTD's Roadway Design Procedures and Details, and the SSRB when it designed and constructed the traffic signal. He stated that all of these design manuals were consistent in stating that signal poles should be placed as far as practicable from the travel lane. However, he admitted that the GDHS allowed design engineers the flexibility when designing a roadway to consider the clearance values provided by the design manuals in relation to situations existing in the field.

Mr. Robert testified that both the 2003[12] and 2009[13] editions of MUTCD, required signal poles to be placed as far as practicable from the travel lane without adversely affecting signal visibility. Moreover, he stated that Section 2A.19 of MUTCD required DOTD to place signal poles a minimum of six feet from the shoulder. Section 2A.19 stated that the minimum lateral offset for an overhead sign support shall be six feet "from the edge of the shoulder (or if no shoulder exists, from the edge of the pavement) to the near edge of overhead sign supports (cantilever or sign bridges)[.]"

Mr. Robert testified that pursuant to MUTCD, signal visibility was important in order to avoid confusion over which lane was controlled by the signal indicator. He stated that moving the signal pole six feet from the shoulder would not have impaired signal visibility because the signal pole's mast arm extended three feet past the turn lane. Thus, although a readjustment of the signal indicator would have been required, signal visibility would not have been impaired. Mr. Robert further agreed that had Mr. Duberville located the signal pole so that the end of the mast arm was even with the end of the turn lane, as he indicated was his intent in his deposition, the accident would not have occurred.

---

[12] Part 4. Highway Traffic Signals, Chapter 4D.19.

[13] Part 4. Highway Traffic Signals, Chapter 4D.33.

Mr. Robert testified that the TSDM also required the signal pole to be located a minimum of six feet from the shoulder. He stated that because Hwy 385 was uncurbed, the signal pole's desirable clearance was six feet from the shoulder. He stated that based on DOTD's Roadway Design Procedures and Details manual,[14] six feet was the preferred clearance. Mr. Robert explained that the twelve-foot clearance would only apply if the roadway did not have a shoulder. He further disagreed that DOTD technically complied with the minimum six-foot clearance because the signal pole was four feet from the shoulder and the shoulder was two-foot wider than the eight-foot minimum UA2 shoulder width.

Mr. Robert testified that the SSRB (2006) required signal-pole placement to comply with MUTCD and provided a minimum clearance of two feet from the shoulder and ten feet from the travel lane. He admitted that the design and construction of this roadway was governed by these specifications.

Mr. Robert described the Signal Details as a "typical" sheet with notes concerning the traffic signal and installation details. He stated that No. 5(A) required signal poles to be placed as far as practicable from the travel lane in accordance with MUTCD, which he said, according to Section 2A.19, was a minimum of six feet from the shoulder. He stated that No. 5(B) required signal poles on rural or uncurbed areas to be placed as far as practicable from the pavement, but with a minimum clearance of two feet from the shoulder or, if there was no shoulder, ten feet from the pavement.

---

[14] Section 2.2.1 of the Roadway Design Procedures and Details stated:

As shown in the design guidelines, values are given for the preferred and acceptable conditions. For all items, the designer should strive to provide the preferred value. If conditions on a project will not allow the use of the preferred value, the acceptable value should be used. The use of a value less than acceptable will require a design exception, as discussed in Section 2.3.

41

Mr. Robert testified that based on these two sections, there was a disconnect between the engineering group and the construction group because the engineering group was bound by MUTCD, and the construction group was bound by the SSRB. He stated that there was a further disconnect between the traffic signal designer, Ms. Colvin, and Mr. Duberville because Ms. Colvin failed to follow MUTCD's and the TSDM's six-foot clearance, and Mr. Duberville applied No. 5(B)'s minimum clearance even though Hwy 385 was not a rural highway. However, under cross-examination, Mr. Robert admitted that No. 5(B) also applied to uncurbed urban areas, such as Hwy 385, a UA2 roadway. He further admitted that Mr. Duberville's placement of the signal pole four feet from the shoulder complied with No. 5(B)'s two-foot clearance. He added that because the roadway contained a shoulder, the ten-foot clearance was inapplicable.

Mr. Robert testified that the information contained in the Signal Details was generic, rather than site specific, and was inserted by DOTD in every traffic signal design. He stated that the conflicting horizontal distances provided by MUTCD, the TSDM, and the Signal Details led to confusion regarding the proper distance the signal pole should have been located from the shoulder. Thus, he said that Mr. Duberville should have followed the more specific TSDM, rather than the generic Signal Details when locating the signal pole.

Mr. Robert also claimed that the posted speed at the intersection was too high because it was unusual for a roadway to be posted at a higher speed than its design speed. He explained that design speed is based on a roadway's functional classification, which in turn is based on roadway geometry, stopping sight distance, and off-road development. In this case, he said that because Hwy 385 was classified as a UA2, it had a design speed of 45 mph. He further stated that because 55 mph was quite higher than 45 mph, DOTD's deviation from 45 mph

required a design exception, which it failed to obtain. However, he admitted that design speed was different from posted speed and that Louisiana's legislature has statutorily mandated the posted speed of highways within the state highway system. Mr. Robert further asserted that DOTD increased Hwy 385's southbound speed from 45 mph to 55 mph just prior to the intersection. He opined that it would have been safer for DOTD to set a consistent posted speed based on factors such as traffic, driveways, interference with obstructions, and roadway operation.

Mr. Robert testified that the only critical thing he saw with the roadway at the point of the accident was the slope in the path of the vehicle where it hit the pole. He disagreed with Sergeant Brett Travis' opinion that Mr. Adams veered off the road and into the pole. Based on his review of the photographs utilized by Sergeant Travis, he thought that Mr. Adams took a fairly straight path into the signal pole, but that he executed a steering maneuver so that the vehicle drove straight into the pole, rather than hitting it at a stronger angle. Although Mr. Robert agreed that Mr. Adams' intoxication was a factor in causing the accident, he did not know if it was the primary factor. He stated that there could have been another factor in the vehicle's cab that caused Mr. Adams to leave the travel lane. However, he admitted that Sergeant Travis found no evidence of anything abnormal in the cab or any braking or movement by the vehicle prior to impact.

Jody Colvin, the traffic signal designer, testified that her design only approximated the location of the signal pole because actual placement was the responsibility of Mr. Duberville. She said that based on surface topography and the project's design, the signal pole was placed in accordance with DOTD's guidelines as far as practical from the travel lane. She further stated that placing a signal pole as far as practical from the travel lane without adversely affecting signal visibility was her goal in every traffic signal design, as required by MUTCD.

43

Ms. Colvin testified that her design was done in accordance with MUTCD and the RDG, as well as DOTD's TSDG, SSRB, and Signal Details. She stated that even if she could not remember during her 2019 deposition, she was aware of MUTCD's and the RDG's guidance when she completed her design in 2007. She explained that although DOTD had adopted MUTCD, its compliance with Section 4D.19 was only recommended, but not required. Ms. Colvin denied that DOTD had adopted AASHTO. However, she stated that in complying with La.R.S. 48:35(A), DOTD utilized the flexibility inherent in the RDG and the GDHS by adopting only those AASHTO guidelines it determined were acceptable and desirable for use on Louisiana highways.

Ms. Colvin disagreed that Section 2A.19 required the signal pole to be placed six feet from the edge of the shoulder. She stated that this guidance only applied to signs, and MUTCD treated signs differently from traffic signals because signs typically are not found at intersections and because their supports typically do not extend over travel lanes or involve electrical devices such as signal indicators.

Ms. Colvin testified that MUTCD required engineers to determine signal-pole placement based either on engineering judgment or through an engineering study. She stated that the practice of engineering does not allow the use of a cookie-cutter approach because no two locations are alike and what works in one location will not work in another. Thus, she said that engineers have to exercise engineering judgment even when applying a mandatory practice. She asserted that she applied her engineering judgment in designing the traffic signal at issue.

Ms. Colvin testified that the signal pole's foundation complied with MUTCD despite the fact that it extended more than four inches above the ground. She stated that once DOTD determined that the overall safety of an intersection

44

required a traffic signal, it did whatever was necessary for the traffic signal to operate as safely and efficiently as possible, including locating it in the foreslope of a ditch on a foundation such as the one at issue. She said that DOTD had built comparable foundations all over the state due to surface-topography issues.

Ms. Colvin testified that although MUTCD restricted breakaway signal-pole foundations from extending more than four inches above the ground, no such restriction existed for rigid signal poles. She further disagreed that DOTD's plans limited the foundation from extending more than four inches above the ground. She explained that signal-indicator height above the roadway is fixed, as is the elevation of the top of the foundation, which has to be level with the roadway crown. Thus, foundation heights can vary due to surface topography. In this instance, she stated that moving the signal pole two feet further to the west would have placed the foundation further in the ditch, requiring it to extend even further above the ground in order for its elevation to reach the required elevation.

Ms. Colvin testified that despite the RDG's clear-zone requirements, the Federal Memo exempted rigid signal poles from being either crashworthy or shielded when located in the clear zone. She stated that the exemption was based on the support required for rigid signal poles and because their safety benefits outweighed the need for them to be breakaway. Ms. Colvin testified that during construction, DOTD did not have mast-arms signal poles long enough to ensure proper signal placement if the signal pole was located outside the clear zone. However, she stated DOTD complied with the RDG because the signal pole was located as far as practicable from the roadway. She testified that in addition to the FHWA exemption, DOTD's decision to use rigid mast-arm signal poles was based on research finding that the safest location for a signal indicator was directly in front of its applicable lane. She stated that the danger posed to motorists from

45

breakaway poles and the frequency of hurricanes in Southwest Louisiana also factored into its decision.

Ms. Colvin acknowledged that although she was not explicitly required by DOTD to consider shielding, she asserted that safety mitigation considerations were factored into her design. She stated that she had to consider and approve every specification and detail of the design, including the type of signal pole used and whether a safety device was required before she could sign and stamp her name to the design. However, she claimed that it would have been inappropriate to shield the signal pole in this instance based on guardrail design and the danger resultant from the placement of a fixed object alongside the travel lane.

Ms. Colvin testified that because Section 1.5.3 of the TSDM contained "or," both minimum clearances were desirable. Thus, she stated that placement of the signal pole fourteen feet from the travel lane satisfied the twelve-foot clearance. Ms. Colvin admitted that the TSDM's minimum clearance varied somewhat from that provided by other DOTD guidance and the Signal Details. However, she denied that this caused a conflict. She explained that the TDSM was used by designers for more situations than signal installations on newly constructed roadways, and the construction plans allowed project engineers and contractors the flexibility to adjust to conditions existing in the field when determining signal pole placement.

Ms. Colvin testified that the Signal Details were based on national guidelines approved by DOTD for use in Louisiana and were included in every DOTD design that contained a traffic signal. She stated that according to No. 22(A), the 2006 edition of the SSRB governed the project. She said that Nos. 5(A), (B) both required signal poles to be located as far as practical from the travel lane in accordance with MUTCD.

46

Ms. Colvin further testified that both minimum clearances provided by No. 5(B) were desirable because of the use of "or," which gave her the option to locate a signal pole either six feet from the shoulder or ten feet from the travel lane. However, she admitted that she said in her deposition that "or" meant that the ten-foot clearance applied only if there was no shoulder. Ms. Colvin testified that No. 5(B) differed from MUTCD in that it provided the actual minimum distances, rather than the broad possibilities provided by MUTCD. She stated that DOTD included "whichever is greater" in the guidance in order to provide engineers with two choices because shoulders in the state's highway system varied in width from zero and fifteen feet.

Ms. Colvin testified that because Hwy 385 was an uncurbed urban roadway, No. 5(B)'s clearance was applicable, and the signal pole's location four feet from the shoulder and fourteen feet from the travel lane satisfied both minimum clearances. She further stated that pursuant to No. 16(A), her design only approximated signal pole locations, and Mr. Duberville was authorized to use his engineering judgment to move the signal pole two feet further west from its location in her design. As the design engineer, she said that she would have found any signal pole location acceptable so long as signal visibility was not affected.

Ms. Colvin testified that pursuant to No. 25(A), utility locations shown on the plans were not guaranteed, and those locations did not figure into her design because she assumed that all utilities would be relocated when the roadway was widened. Thus, she said it was more critical for Mr. Duberville to know the location of utilities during the construction phase. Although she was unaware if utilities prevented Mr. Duberville from moving the signal pole two feet further to the west, she stated that doing so would have affected the ditch. She further agreed that the location of the ditch was a limiting factor in moving the signal pole, but

47

she stated that whether the ditch could have been moved was outside her level of expertise.

Ms. Colvin denied that there was a disconnect between DOTD's design group and its construction group. She stated that she tries to do the best job she can by ensuring that the traveling public moves from point A to point B in the safest and most efficient manner possible. She further stated that Mr. Robert was wrong in stating that she failed to follow MUTCD, AASHTO, or DOTD's own guidance. She said that she followed all of the guidance and MUTCD in designing the traffic signal.

Ms. Colvin further testified that the policy established by the Allain Memo was inapplicable in this instance because it was not in effect when plans for the project were approved. The policy provided that the desirable clearance for rigid signal poles on roads with a greater than four-foot shoulder was six feet. She disagreed that DOTD would have adopted the policy sooner had its engineers been more experienced. Rather, she explained that the policy arose from guidelines that were updated as a result of research projects and information obtained from around the country and the world.

Ms. Colvin testified that a roadway's design speed does not factor into its posted speed. In this instance, she stated that DOTD would have already determined whether the roadway required advisory speeds or warning signs based on its 45 mph design speed. She stated that the posted speed would have been determined after construction based on the speed driven by the eighty-fifth percentile driver over the roadway. Ms. Colvin testified that a speed study, performed along a straightaway, determines a roadway's maximum, rather than minimum, speed based on the speed that "everybody feels comfortable and

reasonable going roughly the same speed so we can have the safest roadway that we can have."

Don Duberville, the project engineer, oversaw construction of the project for DOTD. He stated that he considered and approved every signal-pole location at the intersection, and he was satisfied with the location of the subject signal pole because he cleared the utility conflicts, achieved proper signal-pole elevation and signal alignment, and located the foundation in solid ground outside of the ditch. He stated that it was of no concern that the mast arm extended approximately three feet past the edge of the left turn lane.

Mr. Duberville testified that his primary objective as project engineer was to carry out the plans and specifications for the project, whereas it was the designers' responsibility to consider the guidance provided by MUTCD and AASHTO. However, he stated that guidance did not supplant either his or the designers' engineering judgment or his "ability to fit those devices in the constraints given to me on that project." He stated that pursuant to Signal Detail No. 22(A), the project was required to conform to the SSRB (2006), which provided a minimum clearance of two feet from the shoulder or ten feet from the travel lane, whichever was greater. He stated that he exceeded this guidance by placing the signal pole fourteen feet from the travel lane.

Mr. Duberville was absolutely convinced that the signal-pole location satisfied MUTCD and Nos. 5(A), (B) because it was as far as practicable from the travel lane without adversely affecting signal visibility. He was also convinced that the location satisfied the TSDM, the SSRB, and the second part of No. 5(B) because it was located fourteen feet from the travel lane. He further stated that just because No. 5(A) required the signal pole location to comply with MUTCD's

49

minimum clearance, compliance with MUTCD did not convert Section 4D.19's guidance into a mandatory standard.

Mr. Duberville testified that No. 16(A) gave him the authority to use his engineering judgment during the construction of this project. He stated that DOTD "employs licensed engineers to, essentially, take the plans and understand the intent of the designer and also to understand [the] unique project conditions, and then rectify any conflict between the two." Mr. Duberville testified that the "as built" plans differed from the design plans in that they contained his notes regarding any changes he made to the plans in the field. He agreed that building a road required more than just following manuals and guidelines. He said, "The manuals provide guidance and advice, but that doesn't replace the judgment and experience of a project engineer."

Mr. Duberville testified that the traffic-signal design differed from the rest of the construction plans in that it was basically a schematic, consisting of the traffic-signal components and the signal layout, whereas the remainder of the plans contained fixed dimensions and locations. Thus, he stated that the location of the signal pole was his responsibility, and in this instance, its location was influenced by underground utilities located at the intersection, the ditch, foundation placement, and the bordering airport. With regard to the airport, he stated that signal-pole height was limited because the airport's flight plan went right over the intersection.

Mr. Duberville testified that he moved the signal pole further south from the location shown in Ms. Colvin's design due to the presence of two high-pressure gas pipelines, a fuel pipeline, and a fiber optic cable, all running east and west along Hwy 3092's southern lane. Although he did not recall which utilities were present, he stated that underground utilities also ran north and south along both lanes of Hwy 385 and along a twelve-foot corridor located at the outer edge of the

50

right-of-way. Mr. Duberville testified that he utilized his engineering judgment in choosing the signal pole's location because the location was free of utilities and exceeded the minimum clearance provided by the Signal Details. He stated that he did not consider any other location after he chose that location. He agreed that the pipelines did not affect the east and west attitude of the signal pole and that most of the other utilities were located in the utility corridor.

Mr. Duberville testified that utilities are an issue on every construction project, especially five-lane projects such as this because DOTD shares its right-of-way with utility providers. He said that although all known utilities were indicated on the intersection plan sheet, DOTD did not guarantee, as indicated by Signal Detail No. 25(A), accuracy with regard to the location and known presence of all utilities.

Mr. Duberville testified that the section of roadway at the intersection consisted of five travel lanes, two ten-foot shoulders, two ditches, and two twelve-foot utility corridors. He stated that because the ditch was an engineering feature of the project, he was not allowed to move it during construction. He explained that drainage was important because it rained quite heavily in South Louisiana; thus, draining water from the roadway prevented motorists from hydroplaning and protected the integrity of the roadway. He said that the longer water remained on the roadway, the greater the damage to its subgrade.

Mr. Duberville testified that the ditch affected the location of the signal pole because its foreslope tied directly into the shoulder, and the elevation of the ditch's foreslope (1:4) and back slope (1:3) were directed by DOTD's UA2 design standards. He stated that he was not authorized to change a typical section contained in the plan and that moving the ditch would have violated the UA2 design standards. He explained:

51

All of these points are fixed points on the typical section. This foreslope begins at the edge of the shoulder and goes down to the ditch bottom. A 4 foot ditch bottom is the requirement of a typical section.

The back slope also begins on the other side of the other side of the 4 foot ditch bottom and goes up to – returns to the natural ground elevation. Okay? This slope is 1 vertical to 4 horizontal.

. . . .

. . . There's no way to slide this ditch bottom over and keep this slope on a 1 vertical and 4 horizontal. The only way to accomplish that is to change the typical section and somehow create some kind of flat area next to the shoulder before you started the ditch.

. . . .

There's no way to change that unless you would have some sort of design exception by the chief engineer to change the typical section.

Mr. Duberville further testified that it would have been impossible to obtain a design exception to move the ditch due to the utilities that were relocated to the utility corridor. Although he admitted that it could have been moved during the design phase if it was conceded that the minimum clearance for the signal pole was six feet from the shoulder, he denied that the plan's specifications required a six-foot clearance. Mr. Duberville testified that in his opinion, the signal pole was located in the right place. He further stated that the six-foot requirement was guidance rather than a standard DOTD had to comply with.

Mr. Duberville testified that he further saw no reason to move the ditch because "[t]he fact that there was a slope around the curvature of the connection of the two roads is not an issue at all. There is no requirement that it should be flat or anything." He stated that in his thirty-two years of DOTD employment, he had never constructed a road with a flat area between the shoulder and the ditch's foreslope. He said that the shoulder in the southeast quadrant was flatter than the one at issue because that ditch tied directly into property that had been developed

52

and had a raised elevation. Otherwise, he stated that the drainage structures in the southwest and the southeast quadrants were very similar. He said that because the southeast quadrant was flatter, he used his engineering judgment to move the traffic signal controller to that corner, rather than the placing it in the southwest corner as designed by Ms. Colvin.

Mr. Duberville testified that he would not have moved the foundation deeper into the ditch because he wanted to ensure that the signal pole did not fall. He stated that he would have been concerned about moving it further in the ditch because two thirty-six-inch culverts emptied into the ditch, and he expected the ditch to fill with water based on the rainfall experienced in the area. He explained that constant exposure to water increased the risk that the foundation would fail due to the softening of the soil around the foundation.

Mr. Duberville also testified that locating the foundation further in the ditch could have prevented the ditch from draining. He stated that the foundation at issue was three feet in diameter and twelve feet in length and was the largest used by DOTD. However, he stated that moving the foundation further in the ditch would have required him to redesign the foundation in order to increase its size. He explained that the further it was located down the foreslope, the greater the foundation would have had to extend both above and below the ground.

Mr. Duberville testified that there was nothing in the plan or any design manual which restricted the top of the foundation from extending more than four inches above the ground. He explained that the top of the foundation was required to be level with the crown elevation of the roadway because both signal-pole height and signal-indicator height were fixed. Thus, he stated that in order to satisfy these height requirements, the foundation had to be built up so that its top was level with the roadway crown. He explained that the extension of the

foundation fourteen inches above the ground on one side and twenty-one inches on the other side was "just a function of the slope that had to be built for the ditch."

Mr. Duberville testified that he did not consider moving the signal pole even though the mast arm extended three feet past the turn lane because to do so would place it further in the ditch. However, when asked if he could have moved it, he stated, "I don't know that today." He further stated that because mast-arm poles stay up for years, he wanted to ensure that there was ample room on the mast arm for future technological changes, such as flashing yellow signal-indicators and detection devices.

Mr. Duberville testified that the right-of-way, in and of itself, did not limit his placement of the foundation. However, he stated that he could not locate the signal pole on the opposite side of the ditch because the mast arm was not long enough to attain proper signal-indicator placement. Although he indicated in his deposition that his primary objective in locating the signal pole was to ensure that the mast arm extended to the outer edge of the left-turn lane, he testified that a further objective was to place the signal pole as far as practical from the travel lane.

Mr. Duberville agreed that the GDHS (1990) stated that "[t]raffic control devices should be applied consistently and uniformly[,]" but he stated that the word "devices" applied to more than just signal poles. Although he agreed that there was no uniformity in his placement of the signal poles at the intersection, he explained that conditions differed in each quadrant and each location represented his best effort to locate the signal pole as far as practicable from the travel lane. With regard to the foundations, Mr. Duberville testified that "each foundation was set, and the projection out of the ground has to do with the – whether it's sloped or not and the conditions, maybe, that they were tying into."

54

Mr. Duberville testified he was not aware of any disconnect between his office and the design group during the project. He stated that he consulted with the design group and the design consultant as required and that safety was the overriding consideration in all of his decisions. Mr. Duberville testified that he saw no reason to move the signal pole, and if he had to do it again, he would place it in the same location.

Mr. Allain testified that he had no independent recollection regarding either the project or his personal involvement with it. He stated the project originated in 1976, as a rural major collector but was redesigned as a UA2 pursuant to the January 24, 2008 design exception. He stated that DOTD changed the design because the UA2 design required less right-of-way, was less expensive, and had been used in other parts of the state. Mr. Allain testified that the project was developed in accordance with and was governed by the SSRB (2006), and plan revisions were not required after SSRB updates because to require otherwise would prevent DOTD from ever finishing a design plan. He stated that because the project involved a major reconstruction, DOTD's design engineers were required to be familiar with all DOTD guidance in effect when the project was designed. He stated that he was not aware of any policy when the design was approved that required a signal pole to be located an exact distance from the travel lane.

Mr. Allain testified that a project such as this is built by the contractor in accordance with DOTD's final plans. He stated that during construction, any changes found necessary by the project engineer as a result of unanticipated conditions in the field are included in the as-built plans, which show what is actually built during construction. Thus, he said that the project engineer has a tremendous amount of responsibility with regard to a project.

Mr. Allain testified that because traffic signals are constructed by the contractor, their design has to be meticulous:

[Y]ou need meticulous plans showing actual locations of relative to the – the typical section of the roadway where – distances from the edge of the road, relative locations of the stop bars. All of those details are actually formally prepared in the plans and then let the contract – and a contractor does the installation with oversight from a DOTD project engineer.

However, he stated that although Ms. Colvin's design included highly technical details, it did not specify actual signal-pole location because this required the use of basic engineering judgment. He stated that engineering judgment is used to determine the best solution for a particular situation and that all guidelines require engineers to "practice and use our judgment to make decisions."

Mr. Allain testified that the project engineer was responsible for locating signal poles in accordance with DOTD's guidance, and the most important criteria being that the signal pole was located outside the shoulder, as far as practicable from the travel lane. He stated that signal-pole placement is controlled by mast-arm length and signal visibility and that engineers typically determine placement by measuring from the outer edge of the turn lane the corresponding length of the mast arm. He further stated that the required distance between a signal indicator and a stop bar increased the probability that the signal pole will be located near the travel lane or shoulder.

Mr. Allain testified that DOTD usually placed signal poles two feet from the shoulder based on its two-foot requirement for curbed roadways, which allowed a buffer zone for larger vehicles with a tendency to overhang the roadway. Therefore, he stated that it would have been reasonable for Mr. Duberville to locate the signal pole two feet from the shoulder. He further said that DOTD placed

signal poles on shoulders in the past, but that later guidance moved them beyond the shoulder in order to reserve that space for breakdowns and errant vehicles.

Mr. Allain testified that design guidelines for a UA2 roadway specified a minimum clear zone of twenty-four feet. He stated that although the signal pole was located within the clear zone, placement there was necessary because the intersection was controlled by a traffic signal. Although he agreed that fixed objects should not be located within the clear zone, he explained that traffic engineering has made an exception for signal poles because of the impossibility of placing signal poles twenty-five feet from the travel lane, while still maintaining proper signal-indicator placement. Thus, he stated that signal poles should be located as far as practical from the travel lane without affecting signal visibility. He explained that a signal pole's "distance off the shoulder would be a function of what space is available and the head placement."

Mr. Allain did not know why the roadway's shoulder was two feet wider than the UA2 design-standard minimum width of eight feet. He stated the ten-foot shoulder provided more room for drivers than an eight-foot shoulder. He further disagreed that a design exception was required to change the shoulder width from eight to ten feet. He stated, "There's not an exception for more; there's always an exception for less."

Mr. Allain testified that surface topography affects foundation placement because signal-indicator height over the roadway is controlled by the elevation of the top of the foundation. Thus, he said that the lower the top of the foundation was in relation to the roadway crown, the higher it had to extend out of the ground. He stated that if this occurred the foundation would have to be redesigned because for every foot of foundation above the ground, there was one less foot of foundation below ground.

57

Mr. Allain testified that whether it was more reasonable to place the signal pole six feet from the shoulder depended on the ditch. He stated that the further the signal pole was in the ditch, the steeper the slope on which it was located. He further explained that South Louisiana ditches are very soft; thus, placement in the ditch increased the possibility of lateral-support problems caused by the high winds experienced in the region. Although he agreed that it was desirable for the signal pole to be located six feet from the shoulder, he said there would have been no problem locating it less than six feet from the shoulder.

Mr. Allain did not recall the height that DOTD allowed a foundation to extend above the ground. However, he testified that it was necessary for the foundation to extend above the ground in order to prevent corrosion of the bolts connecting the signal pole to the foundation. He further stated that if it was necessary to extend a foundation twelve inches above ground in order to ensure proper signal-pole and signal-indicator placement, DOTD would find that acceptable.

Mr. Allain testified that underground utilities can affect signal-pole placement because utility providers share the right-of-way with DOTD and caution is necessary when placing a foundation because of the likelihood of unknown utilities being present. He explained that utility location should be addressed by the project engineer, rather than the designer, because of the possibility that utilities were placed in the right-of-way subsequent to the design's approval. He stated that all utilities, except pipelines, would be relocated prior to construction.

Mr. Allain testified that it was within the scope of the project engineer's engineering judgment to adjust signal-pole location based on all existing factors including utilities. In this instance, he stated that the signal pole was moved further south from where it was in the design due to the presence of pipelines in the

58

southwest quadrant. Mr. Allain testified that the pipelines would not have affected signal-pole placement unless the design placed the pole on top of the pipelines. In addition to utilities running parallel to Hwy 385, he stated that there also appeared to be utilities located under or along the shoulder of the roadway, which might have affected Mr. Duberville's placement of the signal pole.

Mr. Allain denied that it was a mistake for Ms. Colvin to locate the signal pole on the pipelines when she approximated its location because her design did not involve the utilities. He further denied that it was a mistake for Mr. Duberville to deviate from Ms. Colvin's design because he was authorized to move the signal pole further south. Thus, he stated that Mr. Duberville corrected the design because of the pipelines' presence. He further testified that it was not a violation of MUTCD to move the signal pole further south of the south-bound stop bar because signal indicators are allowed to be located between forty to one hundred fifty feet from the travel lane. In this instance, he stated that moving the signal pole did not change the presentation of the signal indicators.

Mr. Allain testified that he saw no reason for Mr. Duberville to investigate other locations for the signal pole once he determined its present location. He stated that any location Mr. Duberville chose outside of the shoulder would have been reasonable as long as it took into account correct signal placement and underground utility conflicts.

Mr. Allain was questioned about DOTD's EDSM[15] No: IV.7.1.5, issued on September 14, 2009, which stated that due to the prevalence of hurricanes, rigid traffic signals would be used in certain districts and parishes, including District 07, which encompassed Calcasieu Parish. He agreed that the directive required the poles to be located as far as possible from the travel lane; however, he stated that

---

[15] Engineering Directives and Standards

59

"as far as possible" and "as far as practicable" were similar in nature, and his goal in either instance would be to put the signal pole away from the travel lane. Mr. Allain testified that either placement inferred that the engineer was required to make a judgment call. He said that these terms did not mean the maximum or absolute distance from the roadway, and he opined that "[a]s long as it's a safe judgment call, and it can be a tremendous range within that judgment call, and I think that's the case is the – we're within that range. It's a reasonable location and a choice that the project engineer made." He said that while he thought the signal pole was located as far as practical from the travel lane, he was not sure if its location was as far as possible from the travel lane.

Mr. Allain testified that he wrote the Allain Memo in order to establish a consistent policy within DOTD on the issue of rigid signal-pole placement in the clear zone. He stated that the memo updated a 1999 site-specific letter on the use of non-breakaway signal poles within the clear zone. He stated that the policy change, which was based on revisions of MUTCD, the RDG, and the GDHR, still allowed placement of signal poles within the clear zone based on "their uniqueness within the right-of-way and within the clear zone."

Mr. Allain testified that the Allain Memo differed from the 1999 letter in that it contained desirable clearances for signal poles, which the 1999 letter did not. He agreed that the memo provided a desirable six-foot clearance for roadways with a greater than four-foot shoulder, but he stated that this was not a mandatory clearance. He further stated that he was not aware of any guidance recommending a six-foot clearance prior to the memo or if the memo was applicable to the plans when they were approved in 2008.

Mr. Allain testified that design speed differed from posted speed, and "the only similarity" between them was they "both use the word speed." He explained

60

that design speed allowed engineers to quantify various fixtures on a roadway, such as lane and shoulder width, super elevation, stopping sight distances, and horizontal and vertical curves. He stated that a roadway's posted speed was determined through a different process, and it was not inconsistent for a roadway to have a design speed of 45 mph and a posted speed of 55 mph. He stated that Louisiana's legislature has determined that the posted speed for every two-lane roadway in the highway system was 55 mph, but that DOTD was authorized to lower that speed if necessary.

Mr. Allain testified that there was no reasonable way to design a roadway that would prevent intoxicated drivers from leaving the roadway. He stated that assuming that Mr. Adams' blood alcohol level was approximately .13% at the time of the accident, he knew of nothing that DOTD could have done to keep him on the roadway. In fact, he said that when evaluating possible corrections to the highway system as a crash data engineer, he left out data pertaining to intoxicated drivers because there was no way to predict or correct their behavior.

William Temple, DOTD's chief engineer, was not involved in the design or construction of this project. He testified that Hwy 385, which had a history of accidents, was redesigned by DOTD in order to improve the surface of the roadway and to make it safer for motorists. He stated that the project began in the 1990s, but was shelved by DOTD while awaiting funding. Mr. Temple testified that the design plans were finally approved on January 24, 2008, and were governed by the SSRB (2006).

Mr. Temple testified that the project engineer acts as the chief engineer's agent to ensure that the project is built by the contractor according to the plans and specifications. He stated that the information contained in the plans included typical section layouts of roadway geometry, embankment material quantities,

61

earth-moving processes, traffic signal layouts, and traffic considerations. He said that the only information not contained in the plans was the SSRB's specifications.

Mr. Temple testified that based on his review of the as-built plans, there was insufficient room to move the signal pole further away from the roadway. He explained that the right-of-way was very limited at the intersection, and the purchase of additional right-of-way would have been prohibited because the project was funded by the sale of state bonds. He stated that once the money for a project funded in this manner was set, it could not be increased. Thus, he opined that DOTD's inability to purchase additional right-of-way impacted the distance the signal pole could be moved beyond the shoulder.

Mr. Temple was not aware that any underground utilities or drainage problems affected the signal pole's placement. It was his impression that there was just enough room to locate the signal pole off the shoulder. He testified that the design engineers would not have thought it worth the added expense to change the drainage in order to extend the shoulder. He further stated that it would not have been a good engineering decision to place the signal pole further in the middle of the ditch.

Mr. Temple testified that design engineers are required to consider the existing standards when designing a project, and he agreed that both MUTCD and the TSDM recommend signal poles be located as far as practical from the travel lane without adversely affecting signal visibility. While he agreed that the RDG required DOTD to consider alternative designs when putting a signal pole within the clear zone, he stated that this was done during the design process. Mr. Temple testified once the design team determined signal-pole location, it was not required to consider the use of any further safety or mitigating devices, and the reviewing engineer, by stamping the plans, indicated that the design satisfied DOTD's

62

standards. He testified that the project engineer would also go through some type of process in order to determine the best location for the signal pole. He asserted that DOTD incorporated safety into every project, and it spent a great deal of money on safety to the extent practicable. However, he stated that when a project's space is limited, DOTD's options become more limited.

Mr. Temple testified that he was unaware of any DOTD policy that required signal poles to be placed six feet from the shoulder. When asked about the Allain Memo, he agreed that it recommended the placement of rigid signal poles as far as practical from the travel lane without affecting signal visibility and that it recommended signal poles be placed six feet from the shoulder, in accordance with AASHTO. However, Mr. Temple clarified that the six-foot clearance was only a recommendation.

Mr. Temple agreed that EDSM No: IV.7.1.5 stated that rigid signal poles should be located as far as possible from the travel lane. However, he testified that "possible" could mean many things, and the further a signal pole was from the roadway, the longer its mast arm and the larger its foundation, which increased its expense. He stated that here, Mr. Duberville also had to consider the room available within the right-of-way. Thus, he felt that DOTD placed the signal pole as far as practical from the travel lane based on the limited amount of space provided by the right-of-way.

Mr. Temple testified that he did not think DOTD violated any policies, procedures, or guidelines in its placement of the signal pole. While he agreed that the signal pole was located in the clear zone, he stated that its placement there was a permissible exception of the clear-zone policy because of the prohibitive expense associated with locating signal poles outside the clear zone. He stated that in choosing the optimal location for a signal pole, the project engineer had to consider

63

foundation size as well as the distance from both the drainage feature and the shoulder.

Mr. Temple further disagreed that DOTD should have considered the use of an impact attenuator or a guardrail because DOTD's policy did not require their use at intersections. He stated that impact attenuators were only used in medians, and not on the outside of shoulders. Mr. Temple further testified that it would have been impossible to use a guardrail at the intersection due to the restricted space. He stated that the purpose of the guardrail is to deflect vehicles back onto the roadway in the direction they were traveling, but when hit at an intersection, there was a danger that it would be impacted from many different directions. He further testified that a guardrail required a buffer zone between the guardrail and the object being shielded.

Mr. Temple testified that he was not involved in Hwy 385 being posted at 55 mph. However, he explained that design speed is related more to stopping sight distance; thus, there was no reason to post Hwy 385 at less than 55 mph because the roadway was extremely flat. He stated that traffic studies encompass speed and volume, including the number and types of vehicles, as well as lane preference, and DOTD would have performed the traffic study for this roadway prior to construction. He stated that while speed limit was set by state law, DOTD was authorized to reduce that speed if it determined the reduction necessary based on the results of a traffic study performed on the roadway.

Mr. Temple testified that DOTD cannot guarantee the safety of all drivers on its roadways. However, he stated that a lot of what DOTD incorporated into its projects was specifically aimed at safety, including wide-paved shoulders, striping, and raised pavement markers.

64

Dr. Joseph Blaschke, DOTD's expert in highway and traffic signal design, traffic engineering, and accident reconstruction, testified that he considered three issues in determining whether the signal pole at issue was defective: breakaway, horizontal clearance, and shielding. He stated that it was well settled at both the national and state levels that rigid signal poles are not required to be breakaway because of the danger they posed to motorists should they fall into an intersection. He further stated a rigid breakaway signal pole has not yet been developed because most cars cannot generate the energy required to cause a fifty-five-foot mast-arm signal pole to break away when hit.

Dr. Blaschke testified that with regard to horizontal clearance, the national publications, such as MUTCD, the RDG, and all AASHTO manuals, recommend that a signal pole be placed as far as practical from the travel lane. He explained that what is practical is "basically in the eye of the engineer who makes that decision." He stated that the only signal-pole clearance standard provided by MUTCD requires signal poles on curbed roadways to be located two feet from the face of the curb. For uncurbed roadways, he stated that guidelines recommended signal poles be located at least two feet from the shoulder and ten feet from the travel lane. He stated that the two-foot clearance allowed a driver, who was parked on the shoulder, sufficient room to open their door.

Dr. Blaschke testified that the TSDM recommended signal poles be located six feet from the shoulder or twelve feet from the travel lane. He disagreed that Ms. Colvin said the twelve-foot clearance only applied when there was no shoulder. He stated that she was very clear that the TSDM's minimum clearances were either/or, allowing the engineer to choose whether to locate the signal pole six feet from the shoulder or twelve feet from the travel lane. He said that twelve feet from the travel lane was just as desirable a distance as six feet from the shoulder.

65

Dr. Blaschke testified that No. 5(A) of the Signal Details required the signal pole to be located in accordance with MUTCD, and No. 5(B) provided a minimum clearance of two feet from the shoulder or ten feet from the travel lane. He disagreed that it would be a failure of good engineering judgment if the designing engineer failed to look at MUTCD when designing a traffic signal. He testified that he did not look at MUTCD every time he designed a traffic signal because he knew its requirements. With regard to Ms. Colvin's statement from her deposition that she did not remember MUTCD's 2007 requirements, Dr. Blaschke testified, "Well, again, I'll let Mrs. Colvin defend herself. But she – design is 2007 – and you're asking her 12 years later. I'm not sure how much she – remembered everything that was in the MUTCD." He further disagreed that the twelve-foot clearance only applied if the roadway did not have a shoulder.

Dr. Blaschke testified that like DOTD, every state has a set of standard plans and specifications and standard detail sheets like the Signal Details. He stated, "They don't redesign every time they do a traffic installation, they don't redesign the pole and the foundation. They have a standard plan." Dr. Blaschke agreed with Ms. Colvin that anytime he required a variance from a specific detail, he made a note in the design plan. However, he did not know why the TSDM's minimum clearances were not included in the Signal Details.

Dr. Blaschke testified that he found no evidence that DOTD violated MUTCD, the TSDM, or any other manual in its design and construction of the roadway or its location of the signal pole. He stated that he found great consistency between DOTD's design and the designs of other states and his own designs. He further disagreed that there was a disconnect between the designer and the project engineer if Ms. Colvin, hypothetically, was unaware of MUTCD's requirements when she designed the traffic signal, and Mr. Duberville applied the

66

minimum requirements provided by No. 5(B), rather than that provided by MUTCD. He testified that there was no disconnect because MUTCD only required the signal pole to be placed as far as practical from the travel lane without affecting signal visibility.

Dr. Blaschke testified that the most important consideration when locating the signal pole was signal visibility, and he agreed that there was sufficient mast-arm length to allow proper signal visibility even if the signal pole was moved three feet to the west. However, he stated that despite the fact that there was extra mast-arm length, Mr. Duberville chose not to locate the signal pole further west because he did not want to place the foundation in the ditch.

Dr. Blaschke testified that although signal-pole placement was normally the responsibility of the design engineer, here it fell to Mr. Duberville because the intersection was not in place when Ms. Colvin designed the traffic signal. He stated that the fact that she did not know utility locations, was not unusual because she could only assume their locations after their relocation when the roadway was widened. Moreover, he said that utility locations shown on construction plans are only assumed to be approximate, and their exact locations have to be determined by the contractor, project engineer, and utility providers after construction begins.

Dr. Blaschke testified that based upon Mr. Duberville's explanation, his location of the signal pole "made perfect sense." He stated:

> Because that's how – that's how it is in the real world. You have an imperfect world, first of all, and if you're trying to find perfection you'll never find it. So you have to – once you're in the field you have to make adjustments in the field, and that's what – you know, the project engineers do and inspectors in the field, they have to make those decisions.

67

The following discussion occurred between Dr. Blaschke and Ms. Roach's counsel when he was asked if the signal pole was placed as far as practical from the roadway:

**Counsel for Ms. Roach:**

You're saying it's most practical and most reasonable to be right there and not to be another 2 feet.

**Dr. Blaschke:**

Just based on the testimony of Mr. Duberville, that's all I can do, 'cause I wasn't there at the time of the project. But he submitted that location 'cause it met all the qualifications and all requirements, and he thought that was the most practical site. And there's no reason to say it wasn't.

**Counsel for Ms. Roach:**

He said he didn't even consider moving it further.

**Dr. Blaschke:**

I'm sure he didn't he was far enough away from the road already.

**Counsel for Ms. Roach:**

So why is it not possible or practical to move it – move that edge 2 feet over?

**Dr. Blaschke:**

I think – from an engineering viewpoint and the first day I was out there without knowing anything else, I was surprised – I wouldn't say I'm surprised it was that far in the ditch, but I – I was surprised it was more than 2 feet away from the edge of the shoulder, 'cause I would not have wanted to put it any further into the ditch even then.

**Counsel for Ms. Roach:**

If Mr. Duberville did not consider moving it 2 feet over, again, the edge would be about right there. If he didn't even consider that alternative, is that good engineering practice?

**Dr. Blaschke:**

I would say so, 'cause he followed all the requirements. That's the point. He had it further away from the travel lane than he needed it to be.

Dr. Blaschke stated that based on his perspective, Mr. Duberville was not required to consider any other location once he settled on the signal pole's location.

Dr. Blaschke testified that Mr. Allain's explanation that experience was the reason behind the Allain Memo's policy change, did not mean that the previous policy was based on a lack of experience by DOTD's engineers. Instead, he stated that Mr. Allain meant that the policy changed after AASHTO revised its guidance as a result of experience it had gained on the subject matter since its previous revision.

Dr. Blaschke testified that the Federal Memo made it clear that the FHWA did not recommend shielding signal poles. While he agreed that the memo stated that all practicable measures should be taken to reduce the risk posed by signal poles, he stated that "practicable" meant only those measures that were feasible or reasonable, and not all measures that were possible. Dr. Blaschke further stated that "should" meant that the use of practicable measures was not an absolute requirement, but rather something that was encouraged. He further explained that in engineering, "shall" statements are mandatory, but "should" statements are strongly encouraged. He stated that engineers write their own policies and procedures and understand the difference between "shall" and "should." He further clarified that AASHTO did not contain standards, rather it contained guidance.

Dr. Blaschke testified that it was unsafe to use a guardrail at the intersection because it would place a large, fixed object very close to the travel lane. He stated that because a guardrail extends 100 feet upstream from the object being shielded, locating it at an intersection would cause it to extend across the intersection. Thus, the only way a guardrail would work was by wrapping it around the corner. However, Dr. Blaschke testified that once installed, a guardrail, which is rigid,

69

becomes a fixed object and constitutes a danger to motorists. He explained that guardrails are designed to be hit at a slight angle and can cause tremendous damage when hit otherwise. He stated that if DOTD had installed a guardrail, the intersection would have contained a one hundred fifty-foot-long fixed object rather than a three-foot fixed object.

Dr. Blaschke further testified that there was insufficient room at the intersection for a guardrail because it required six feet of a relatively flat area along the shoulder, consisting of a two-foot offset from the shoulder, a two-foot installation area, and a two-foot cushion between the guardrail and the shielded object. He said that based on its surface topography, the intersection would have required significant reconstruction before it would have been possible to place a guardrail there.

Dr. Blaschke testified that there was no way for DOTD to design a roadway that prevents accidents caused by intoxicated drivers. He stated that this would be true no matter whether the signal pole was located two, four, six, or ten feet from the shoulder. He explained that there was no way to predict what would happen after a severely impaired driver lost control of their vehicle, and the clear zone was designed to allow a driver the opportunity to recover control of their vehicle after it left the roadway. Although Dr. Blaschke agreed that the RDG said nothing about whether the driver was awake, he testified that common sense indicated that the only way a driver could recover control was if they were awake. Thus, he claimed that the RDG assumed that the driver was awake and able to regain control of their vehicle. He further opined that the clear zone concept had no effect for unconscious or intoxicated drivers that lost control of their vehicles.

Dr. Blaschke testified that when he visited the intersection, he immediately noticed that the foreslope of the ditch began right at the edge of the shoulder.

70

Based on his observation, he concluded that the space the project engineer had to work with was tight because otherwise he would not have started the ditch right after the shoulder. He further testified that because of the need for drainage, DOTD's placement of the ditch made sense if it had no other alternatives.

Dr. Blaschke testified that whether DOTD could have changed the configuration of the ditch was a question for the design engineer. He stated that moving the ditch would have changed its configuration, as well as infringed on the area provided for utilities beyond the ditch. He stated that in its present configuration, moving the ditch would have resulted in a steeper foreslope and back slope, whereas moving it while maintaining the foreslope and back slope would have made it impossible to maintain the bottom of the ditch. Dr. Blaschke testified that ideally, the ditch would be located further away from the travel lanes. While he agreed that the forty-one feet of right-of-way extending from the travel lane was a lot of space, he stated, "Depends on what you have to do within it[.]" When asked about the utilities located at the intersection, he stated that he could only refer to Mr. Duberville's testimony. However, he agreed that it was common for utilities to share a roadway right-of-way.

Dr. Blaschke testified that it was neither unusual nor improper for the foundation to extend above the ground. He explained that the top of the foundation had to be level with the roadway crown; thus, because it was located in the foreslope, the foundation had to be built up so that the signal pole's mast arm was tall enough to clear the roadway. However, he admitted that it was unusual to place a foundation in the foreslope of a ditch.

Dr. Blaschke testified that the concern with putting the foundation in the ditch was related to the possibility that it would be affected by water. He stated that the traffic signal's electrical connections are located at the base of the pole and

71

would be affected if covered by water. He said that the greater concern was that constant exposure to water would cause the soil surrounding the foundation to soften, causing the signal pole to fall. Additionally, Dr. Blaschke testified that moving the foundation further into the ditch would have required it to extend at least another foot above the ground in order to maintain the proper elevation level with the roadway crown. Although he did not know if the ditch's soil was too weak to support the foundation, he stated that the closer the foundation was to the bottom of the ditch, the weaker it would have been.

Dr. Blaschke disagreed with Mr. Robert's pronouncement that posted speed should be the same as design speed. He stated, "The critical issue of any highway is providing adequate sight distance for the driver driving down the highway to see an object and stop." He explained:

> Design speed is a selected speed to allow the engineer to design a highway to provide the stopping sight distance for that speed. The critical issue of any highway is providing adequate sight distance for the driver driving down the highway to see an object and stop.
>
> So sight distance is the primary element of highway design. If you select a design speed of whatever mile an hour it is, you design a highway to make sure you always have that amount of stopping sight distance for that speed.
>
> For instance, 45 miles an hour is about 450 feet. That's the stopping sight distance.
>
> We have in our geometric design horizontal and vertical curves that we select to provide at least that amount of sight distance.
>
> So if we design for 45 miles an hour and we provide one of those minimum vertical curves or horizontal curves, then we're at basically the minimum sight distance for that speed.
>
> On the other hand, if we select 45 miles an hour for a design speed and the roadway is flat and straight, we basically have provided, you know, half a mile of sight distance, and that's the design speed of 160 miles an hour.
>
> So we're not going to design for 160 miles an hour. But the bottom line is, you have plenty of sight distance available for speeds

72

well beyond 45 miles an hour. And drivers are gonna drive the speeds they're comfortable.

This is an area – of a suburban area not well developed, wide travel lanes, wide median and wide shoulders, it's a wide median and wide shoulders, it's a wide-open area and it will encourage drivers to drive faster because of its configuration.

So it's not unusual why they have the speed in this case to be posted over 45 miles an hour. In Texas alone all our frontage roads on our freeways have a 45 miles an hour design speed, and a high percentage of them have speed limits over 45 because adequate sight distance is there and drivers drive accordingly. That's why they're not related really.

After reviewing the investigating state trooper's accident diagram, Dr. Blaschke testified that it did not indicate that the roadway caused Mr. Adams to leave the travel lane. He stated that the accident report indicated that Mr. Adams drifted off the roadway and hit the signal pole. He stated that Mr. Adams was significantly impaired and was not in control of the vehicle when that occurred; thus, the logical conclusion was that either his impairment or fatigue caused him to lose control.

In *Fontenot v. Patterson Insurance*, 09-669 (La. 10/20/09), 23 So.3d 259, the supreme court reversed an appellate decision finding DOTD partially at fault for a vehicular collision that occurred at an intersection designed and in the custody of DOTD. There, the plaintiffs and their insurer alleged that DOTD's liability stemmed from the unreasonably dangerous condition of the intersection resulting from the absence of a stop bar and the flashing configuration of the traffic signal. DOTD emphatically disputed that the intersection was either defective or a cause-in-fact of the plaintiffs' injuries. Noting that the jury in the case was faced with conflicting expert testimony relative to whether the intersection was unreasonably dangerous, the supreme court reinstated the jury's verdict, stating as follows:

73

Having reviewed and considered the evidence in its entirety, it is evident the parties essentially agree on the salient facts surrounding the accident, and the jury's decision as to the DOTD's liability turned on its choice between two theories of liability presented by the experts. Employing the principles of appellate review, our only inquiry at this stage is whether the jury's factual findings were reasonable, regardless as to how we may have weighed the evidence sitting as trier of fact. *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978). In the absence of finding the testimony of the DOTD's experts to be so internally inconsistent or implausible, this Court is barred from discrediting their statements to conclude the jury's findings were clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844-845 (La.1989). This is attributable to the fact the jury was in a better capacity to evaluate the demeanor of the live witnesses, as compared with our access to only a cold record. *Id.*, 549 So.2d at 844 ("When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said."). Under this standard, we are aware that when "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." *Id.*, 549 So.2d at 844-845.

Applying these precepts, we find no error in the jury's decision to place greater weight on the evidence presented by the DOTD. The evidence was not in any respect internally inconsistent or unworthy of belief to warrant a substitution of the jury's credibility determination.

*Id.* at 273.

On the issue of duty, the supreme court, in *Petre v. State, through Department of Transportation and Development*, 01-876, p. 12 (La. 4/3/02), 817 So.2d 1107, 1114, refused to create a rule that would prevent an intoxicated driver from recovering from DOTD "even when an unreasonably dangerous defect in the road is a substantial factor in contributing to an accident." Rather, the court, quoted with approval, the appellate court's finding that:

> While no one would take issue with the fact that Ms. Petre's unacceptable and illegal actions in driving while intoxicated should be weighed heavily against her in considering the extent of DOTD's duty to her, intoxication alone is not enough to automatically prevent her from recovering for DOTD's fault. It is merely a

74

factor to consider in Louisiana's comparative negligence scheme.

*Id.*

Accordingly, the fact that Mr. Adams was intoxicated at the time of the accident is just one issue to be considered in determining the comparative fault of all parties in this matter. Thus, we find no merit in DOTD's argument on this issue.

In the instant case, the jury was faced with valid arguments for and against whether the design and construction of the intersection was defective, whether the location of the signal pole was defective, and whether DOTD should have taken any practicable measures to render its location safer. In essence, the jury was faced with a choice of two theories of liability as presented through the testimonies of the expert witnesses.

Mr. Robert testified that DOTD had approximately three feet of mast arm available such that the signal pole's foundation could have been moved three feet further away from the shoulder. Based on his testimony, three feet would have made the difference in whether the vehicle actually collided with the foundation. Several of DOTD's witnesses acknowledged that there was an additional three feet of mast arm. Thus, if there was an additional three feet by which the signal pole could have been moved further away from the shoulder, was the post actually "as far as practicable" from the shoulder or the travel lane? The jury answered "no" to this question.

Further, Mr. Robert testified that DOTD should have designed the southwest quadrant of the intersection consistent with the other three quadrants, so that the area off the shoulder was more level, which would have allowed the signal pole to be moved two feet further away from the shoulder. He claimed that the steepness of the foreslope, located right off the shoulder, and the location of the signal pole

led to the risk that a vehicle, leaving the shoulder, would be pulled into the signal pole, such as happened in this instance.

Additionally, Mr. Robert's opinion was that as this was not a breakaway pole, DOTD was required to consider the use of some type of mitigation strategy, including rumble strips, impact attenuators, or guardrails. None were employed in this case. Mr. Robert further opined that the speed limit through the intersection should have been 45 mph, in alignment with its design speed, rather than the 55 mph that it was posted by DOTD. Finally, Mr. Robert was of the opinion that it was improper for DOTD to build the signal pole's foundation so that it extended fourteen and twenty-one inches above the ground. As an appellate court, it is not our function to question the jury's conclusions, so long as those conclusions are based on the jury's evaluation of the witnesses, including expert witness opinions, and those opinions are not internally inconsistent with the facts. We find that they are not in this case.

DOTD further argues that there was no proof for the jury to conclude that it had either actual or constructive knowledge of the defective condition posed by the signal pole's location at the intersection. We disagree. The Allain Memo clearly reflects that DOTD had changed its policy to require rigid signal poles to be located at least six feet from the shoulder. By its own policy, DOTD clearly had actual knowledge that the signal pole at issue should have been located at least six feet from the shoulder, and it had this knowledge approximately six months prior to the accident. Accordingly, we find there was adequate evidence presented for the jury to conclude that DOTD had actual knowledge of the signal pole's defective condition.

We further find that the jury was presented with differing views of the evidence with regard to whether the defective condition of the signal pole was a

76

cause-in-fact of Plaintiffs' injuries. It is undisputed that Mr. Adams was intoxicated at the time of the accident. However, although Dr. Blaschke found that this was the primary factor in causing the accident, Mr. Robert, while admitting that it was a factor, could not say that it was the primary factor in causing the accident. Further, it was Mr. Robert's opinion that there was a risk that a vehicle leaving the roadway would be pulled into the signal pole due to the steepness of the foreslope and the signal pole's placement in the foreslope. Dr. Blaschke even testified that ideally, the ditch would have been located further from the shoulder and that it was unusual to place a signal pole's foundation in the foreslope of a ditch. Accordingly, we find that it was not manifestly erroneous for the jury to find that the steepness of the ditch's foreslope and the location of the signal pole was a cause-in-fact of the accident.

Based on our review of the record, we find nothing internally inconsistent, implausible, or unworthy of belief in the jury's decision to credit Mr. Robert's testimony over that of Dr. Blaschke. Thus, even though we may have weighed the evidence differently had we been sitting as trier of fact, we cannot say that it was manifestly erroneous for the jury to place greater weight on the evidence presented by Plaintiffs rather than on that presented by DOTD. Accordingly, the judgment of the trial court allocating DOTD twenty percent of the fault in this matter is affirmed.

### Assignment of Error Number Ten

In its final assignment of error, DOTD argues that the trial court abused its discretion in taxing it with all trial and court costs despite the fact that it was only allocated twenty percent of the fault for the accident; by improperly allowing certain expenses as court costs; and by failing to award it any of its own trial costs. Specifically, DOTD argues that because it was found only twenty percent at fault,

77

the trial court could also have assessed costs against Allstate, the liability auto insurer of Mr. Adams' parents, and State Farm, the liability auto insurer of the 2013 Honda Accord driven by Mr. Adams at the time of the accident. It further argues that the trial court should have denied or reduced specific expert witness fees and the costs charged by Scan Solutions.

Subsequent to the jury trial, Plaintiffs filed a joint motion to tax as trial costs amounts spent on depositions, expert witness fees, and trial expenses in the amount of $45,804.30 for Ms. Roach and $31,943.71 for the McVeys. They further moved to have all court costs assessed to DOTD. DOTD also filed a motion seeking to have its trial expenses, in the amount of $26,023.15,[16] taxed as costs against Plaintiffs, Allstate, and State Farm.

Following a September 9, 2019 hearing, the trial court orally assessed DOTD with all of Plaintiffs' trial and court costs. In its September 17, 2019 written judgment, the trial court assessed DOTD with Ms. Roach's trial costs of $45,354.30 and the McVeys' trial costs of $32,174.71.[17] It further assessed DOTD with Ms. Roach's court costs of $9,260.00 and the McVeys' court costs of $2,960.90.

The law pertaining to the award of costs was thoroughly examined in *Reynolds v. Louisiana Department of Transportation*, 15-1304, pp. 3-4 (La.App. 1 Cir. 4/13/16), 194 So.3d 56, 59 (alteration in original):

---

[16] In its motion and memorandum in support of its motion to tax costs, as well as its supplemental memorandum, DOTD sought to have $26,0233.15 taxed as trial costs. However, based on the amounts listed in the spreadsheet attached to its motion, the correct amount it sought to have taxed as trial costs was $26,023.15.

[17] At the hearing, the McVeys supplemented their trial expense list, which added a $115.00 fee for a video copy of Trooper Brett Davis' deposition to the $31,943.71 requested. In awarding the McVeys $32,174.71 in costs, the $115.00 fee was added twice, and the trial court added an extra dollar to the amount. The correct amount of costs awarded by the trial court should have been $32,058.71. Although this error in calculation was not raised on appeal, we correct the mistake based on the power granted to this court by La.Code Civ.P. art. 2164.

78

The district court is not required to tax the costs of the defense's experts and witnesses against an unsuccessful plaintiff. *Bourgeois v. Heritage Manor of Houma*, 96-0135 (La.App. 1st Cir.2/14/97), 691 So.2d 703, 707. Nevertheless, the law is well settled that the party cast in judgment will *generally* be assessed with all costs of the litigation, including its own and those of the prevailing party. *See* La.Code Civ. P. art.1920; *Bonfanti Marine, Inc. v. State Through Div. of Admin.*, 444 So.2d 218, 219 (La.App. 1st Cir.1983). Louisiana Code of Civil Procedure article 1920 allows the district court an option to make a different provision for costs based on equity, providing as follows: "[e]xcept as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."

The district court has great discretion in awarding costs, including expert witness fees, deposition costs, exhibit costs, and related expenses. *Arnaud v. Scottsdale Ins. Co.*, 2015-0185 (La.App. 1st Cir.9/18/15), 181 So.3d 759, 761. On appeal, the district court's assessment of costs will not be disturbed absent an abuse of discretion. *Polk Chevrolet, Inc. v. Webb*, 572 So.2d 1112, 1116 (La.App. 1st Cir.1990), *writ denied*, 575 So.2d 394 (La.1991). Moreover, an assessment of costs against a prevailing party is considered an abuse of discretion absent proof that the prevailing party incurred costs pointlessly or engaged in other conduct that justified the allocation. *Id.*

As pointed out by Ms. Roach both at the hearing to tax costs and in her appellate brief, the only party named as a defendant in her petition was DOTD. As provided by La.Code Civ.P. art. 1920, "Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause." Thus, because DOTD was the only defendant in Ms. Roach's suit, it was the only party which could be cast with costs. Accordingly, there was no error in the trial court casting it with all of Ms. Roach's trial and court costs.

With regard to the McVeys' trial and court costs, this court has held that "[a]ssessing a negligent party with all court costs when other parties are jointly liable is not a *per se* abuse of the trial court's discretion." *Renfro v. Burlington N. Santa Fe Ry. Co.*, 15-372, p. 25 (La.App. 3 Cir. 5/11/16), 193 So.3d 1192, 1210-11.

On August 22, 2016, the trial court granted judgment in favor of State Farm, as the liability insurer of a 2011 Chevrolet 1500 and a 2013 Hyundai Sonata,

vehicles owned by the McVeys, and dismissed the McVeys' claims against it, with prejudice. An order dismissing the McVeys' claims against State Farm, in its capacity as the liability insurer of the two named vehicles, was rendered by the trial court on October 5, 2017. The order stated that State Farm was to "be dismissed with prejudice, with all costs awaiting the final disposition of this matter."

On March 30, 2017 and July 11, 2017, the McVeys entered into partial settlements with Mr. Adams and Allstate, as his liability insurer, and with Mr. Adams and State Farm, as the liability insurer of the 2013 Honda Accord. In both settlements, the McVeys reserved their rights against Mr. Adams, only to the extent necessary for them to maintain a direct action against a non-settling insurer, and against DOTD. Orders dismissing the McVeys' claims against these parties, with prejudice, were rendered by the trial court on April 27, 2017 and August 10, 2017. Both orders stated that the dismissals were subject to the dismissed party paying their own court costs.

At the conclusion of the September 9, 2019 hearing on the motions to tax costs, the trial court rendered the following oral ruling:

> To say that this was a contentious matter would be an understatement, and it became fairly certain to all very much from the beginning of this trial as to who this trial was really versus. Although in the McVey matter Mr. Adams was a nominal defendant, it was very clear from the very beginning, from opening statements, that Mr. Adams . . . didn't really have any real exposure or expectations of recovery from him. All of that being said, I recognize that the [S]tate Department of Transportation and Development was determined after trial in this matter to be the [sic] 20 percent at fault for the recovery. I am going to tax all of the costs to the Department of Transportation and Development in Victoria Roach, 2014-4275, Department of Transportation and Development, that those costs are $45,354.30.
>
> In Michael McVey, Norma McVey, 2014-4289, Department of Transportation and Development, Allstate, State Farm, and Ryan Adams all of those costs of $32,174.71, as well as the court – clerk of court costs, whatever those are. Those are documented. I'm sure the clerk will let the Department of Transportation and Development know what they expect.

After reviewing the record, we find that the trial court did not abuse its discretion by assessing all of the McVeys' trial and court costs against DOTD. The only other defendant remaining in the suit at the time of trial was State Farm, in its capacity as the UM carrier of the 2013 Honda Accord. All other defendants had been dismissed from the McVeys' suit approximately two years earlier. Thus, the trial court did not abuse its discretion by not assessing the dismissed defendants with court costs. Additionally, in its motion to tax costs, DOTD only sought to have State Farm, in its capacity as the liability insurer of the McVeys' three vehicles, taxed with costs. It did not seek to have State Farm, in its capacity as the UM carrier, taxed with costs. Accordingly, we find no abuse of discretion in the trial court's decision to assess DOTD with all of the McVeys' trial and court costs or its decision denying DOTD's request for court costs.

DOTD next argues it was an abuse of discretion for the trial court to award the full expert witness fee of Jeffrey Peterson, a rehabilitation counselor; the full expert witness fee of Mr. Robert in the amount of $11,570.00, for work done outside the courtroom and $10,908.12 for trial testimony and a hotel bill; the expert witness fee of Dr. William George, a toxicologist, in the amount of $5,775.00; $450.00 for the report by Dr. Bettinger that the trial court excluded from evidence; and all costs charged by Scan Solutions, who assisted all parties with the electronic exhibits and video depositions during the trial.

> The question of whether the assessed costs are excessive is a separate issue. Taxable costs are defined narrowly by positive law in La. R.S. 13:4533 to include "costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court[.]" Generally, "on the trial" has been held to include costs that are necessary to investigate and defend a lawsuit and to bring a case to trial on a motion for summary judgment. *See Riddle v. Louisiana Power and Light Co.*, 94-1386 (La.App. 1st Cir.4/7/95), 654 So.2d 698, 703, *writ denied*, 95-1599 (La.9/29/95), 660 So.2d 871; *Breaux v. Romero & Associates, Inc.*, 95-691 (La.App. 3d Cir.11/2/95), 664 So.2d 683, 686-87. Further, the taxing of

81

medical records costs and expert witness fees is governed by La. R.S. 13:3666. As to expert witness fees in particular, La. R.S. 13:3666 provides, in pertinent part, as follows:

> A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
>
> B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
>
>> (1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
>>
>> (2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall for [sic] a part of the final judgment in the cause.

Expert witnesses are entitled to reasonable compensation for their time in court and for preparatory work done. *Bourgeois*, 691 So.2d at 708. A district court can fix expert witness fees based upon its own observations and evidence presented at trial. *See Smith v. Roussel*, 2000-1672 (La.App. 1st Cir.6/22/01), 808 So.2d 726, 730. However, a party can only have taxed as court costs the reasonable cost of time spent by the expert in gathering facts necessary for his testimony, but not for time spent in consultation that only assists the attorney in preparation for the litigation. *Id.*, 808 So.2d at 731.

. . . .

The district court may award the full amount charged by an expert witness if the amount is reasonable in light of the many factors considered in fixing expert witness fees, such as time spent in preparatory work for trial, the extent and nature of the work performed, the knowledge, attainments, and skill of the expert, and the helpfulness of the expert's report and opinion to the district court. *See Bourgeois*, 691 So.2d at 708. *See also Albin v. Illinois Cent. Gulf R.*

*Co.*, 607 So.2d 844, 845-46 (La.App. 1st Cir.1992). Generally, the amount and fixing of expert fees lies within the sound discretion of the district court and will not be disturbed in the absence of an abuse of discretion. *Bourgeois*, 691 So.2d at 709. Fees of expert witnesses may be reduced if expenses were needlessly or excessively incurred. *Wampold v. Fisher*, 2001-0808 (La.App. 1st Cir.6/26/02), 837 So.2d 638, 640.

*Reynolds*, 194 So.3d at 59-61 (first alteration in original).

Other than laying out the factors a trial court should consider in fixing the expert fees that will be assessed as costs, DOTD does not state why Ms. Roach should not receive the entirety of Mr. Peterson's $18,346.04 expert witness fee. In its supplemental memorandum, DOTD argued that Ms. Roach was only entitled to recover $3,788.00 of Mr. Peterson's fee that reflected the amount of actual trial work performed by him. However, as the remainder of his fee represented work he performed in preparation for trial, we find that the trial court did not abuse its discretion by assessing as costs the entire $18,346.04 fee.

DOTD next argues that the trial court abused its discretion by awarding the McVeys the total amount of Mr. Robert's expert witness fee, which totaled $22,478.12, including a $173.12 hotel bill. DOTD argues that the McVeys are only entitled to recover the $10,735.00 that represented Mr. Robert's actual trial work, but not the $11,750.00 that represented work performed outside of the court room, as well as a $173.12 hotel-room charge. As above, we find that the trial court did not abuse its discretion in assessing as costs Mr. Robert's $11,750.00 fee for work he performed in preparation for trial.

However, we do find it was an abuse of discretion for the trial court to award the McVeys the $173.12 for Mr. Robert's hotel room. In *Meyers v. Broussard*, 96-1634 (La.App. 3 Cir. 5/21/97), 696 So.2d 88, this court held that La.R.S. 13:3666 does not provide recovery of travel expenses as part of an expert witness fee. Rather, we held that travel expenses for in-state witnesses, as provided by La.R.S.

13:3661, allowed reimbursement for hotel and meal expenses for those witnesses compelled to appear at civil trials at a rate of $5.00 per day. In *Meyers*, 696 So.2d at 102, we stated, "While we recognize that the amount authorized is woefully inadequate for travel expenses, it is the only statutory authority for such an award." Thus, we amend the amount awarded for Mr. Robert's hotel-room charge from $173.12 to $5.00. Accordingly, the amount awarded for Mr. Robert's expert witness fee is amended from $22,478.12 to $22,310.00.

DOTD next argues that the trial court abused its discretion by assessing as costs the $5,775.00 expert witness fee of Dr. George, who was hired by Ms. Roach to counter testimony by Dr. Wimbish relative to the effect that Mr. Adams' pre-accident marijuana use had on his impairment. However, Dr. Wimbish's testimony was excluded by the trial court after Plaintiffs moved to exclude the evidence via a motion in limine. During the hearing on the motion, counsel for Ms. Roach stated that Dr. George was hired after Dr. Wimbish testified in his deposition that Mr. Adams' marijuana use increased his impairment, contrary to his report's finding that Mr. Adams' impairment was alcohol-related only. Following the trial court's exclusion of Dr. Wimbish's testimony on this issue, counsel for Ms. Roach indicated that Dr. George would not testify at trial.

In *Burtner v. Lafayette Parish Consolidated Government*, 14-1180 (La.App. 3 Cir. 4/15/15), 176 So.3d 1056, *writ denied*, 15-938 (La. 6/19/15), 169 So.3d 350, this court affirmed a cost award for the preparation of an expert report, which although not used by the plaintiff at trial, was instrumental in the defendants' withdrawal of an affirmative defense. In rejecting the defendants' argument that the trial court erred in awarding this cost because the expert did not testify at trial, this court stated:

Defendants argue that La.R.S. 13:3666(A) provides in pertinent part that "[w]itnesses called to testify in court only to an opinion founded on special study or experience in any breach of science . . . shall receive additional compensation, to be fixed by the court, with reference to the value of the time employed and the degree of learning or skill required." The above statute in no way prevents the trial court from awarding court costs for the preparation of Dr. King's report. It simply allows, in the trial court's discretion, for "additional compensation" to be awarded should Dr. King be required to testify in court. Thus, there was no error in this award.

*Id.* at 1065 (alteration in original).

As Dr. George's report was utilized in Plaintiffs' successful motion in limine to exclude portions of Dr. Wimbish's testimony, we find that the trial court did not abuse its discretion in assessing his $5,775.00 fee as costs.

DOTD next argues that it was an abuse of discretion for the trial court to assess as costs $450.00 for the report by Dr. Bettinger that the trial court excluded prior to trial. However, counsel for Ms. Roach stipulated at the hearing on the motion that he was subtracting this fee from the amount she was seeking as costs. Although Ms. Roach initially sought $45,804.30 in trial costs, the amount awarded by the trial court was $45,354.30, with the difference between the two amounts being $450.00. Accordingly, we find no merit in DOTD's argument on this issue.

Finally, DOTD argues that the trial court erred in awarding as costs all amounts charged to Ms. Roach and the McVeys by Scan Solutions. In a footnote, DOTD explained that Scan Solutions' services were utilized by all parties during the trial "to assist with the display of electronic exhibits and the playing of video depositions." It stated, "This was done as a convenience to the parties, and because these costs do not fit within the definition provided by La.R.S. 13:4533, these costs should not have been assessed against" it. We find no merit in this argument.

85

In their joint motion to tax costs, Ms. Roach sought $3,908.25 and the McVeys sought $3,647.00 in charges from Scan Solutions. In *Mace v. Turner*, 18-339, pp. 6-7 (La.App. 3 Cir. 12/6/18), 2018 WL 6433016, this court held that exhibit and technology costs assessed by the trial court as court costs "were reasonable and fall under the 'other costs allowed by law' noted in La.R.S. 13:4533." Accordingly, we find no abuse of discretion in the assessment of these charges as court costs.

## DECREE

Based on the foregoing, the judgment of the trial court awarding Michael Lee McVey and Norma Cheryl McVey $32,174.71 in trial costs is amended to award $31,890.59 in trial costs. The judgment of the trial court in favor of Victoria Roach and Michael Lee McVey and Norma Cheryl McVey is affirmed in all other respects. In accordance with La.R.S. 13:5112, the costs of this appeal are assessed to the State of Louisiana, through the Department of Transportation and Development in the amount of $28,134.10.

**AFFIRMED AS AMENDED.**